# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP1261-CR |
| COMPLETE TITLE: | |

State of Wisconsin,
        Plaintiff-Respondent,
    v.
Navdeep S. Brar,
        Defendant-Appellant-Petitioner.

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 371 Wis. 2d 564, 884 N.W.2d 535
(2016 – Unpublished)

| | |
|---|---|
| OPINION FILED: | July 6, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 12, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | John W. Markson |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | R.G. BRADLEY, J. concurs (opinion filed). KELLY, J. concurs, joined Part I by R.G. BRADLEY, J. (opinion filed). |
| DISSENTED: | ABRAHAMSON, J. dissents, joined by A.W. BRADLEY J. (opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs by *Tracey A. Wood, Sarah M. Schmeiser,* and *Tracey Wood & Associates*, Madison, and an oral argument by *Sarah M. Schmeiser.*

For the plaintiff-respondent, there was a brief by *David H. Perlman*, assistant attorney general, and *Brad D. Schimel*, attorney general, and an oral argument by *David H. Perlman*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2015AP1261-CR
(L.C. No.  2014CT776)

STATE OF WISCONSIN                    :        IN SUPREME COURT

State of Wisconsin,

      Plaintiff-Respondent,

      v.

Navdeep S. Brar,

      Defendant-Appellant-Petitioner.

**FILED**

**JUL 6, 2017**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals.  *Affirmed.*

¶1   PATIENCE DRAKE ROGGENSACK, C.J.  We review an unpublished decision of the court of appeals[1] affirming the conviction of Navdeep Brar (Brar) for operating while intoxicated, third offense in violation of Wis. Stat. § 346.63(1)(a) (2014-15)[2] and an order of the circuit court denying Brar's motion to suppress the results of a blood test.[3]

---

[1] State v. Brar, No. 2015AP1261-CR, unpublished slip op. (Wis. Ct. App. July 7, 2016).

[2] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

[3] The Honorable John W. Markson of Dane County presided.

¶2  Brar moved to suppress the results of a blood test on the grounds that it was an unconstitutional search. Specifically, he argued that he did not consent to having his blood drawn, and therefore, the officer was required to obtain a warrant. The circuit court denied Brar's motion and found that Brar had consented. On appeal, Brar argues that, even if he had consented, his consent was not given voluntarily.

¶3  We conclude that the circuit court's finding that Brar consented to the blood draw was not clearly erroneous. Additionally, we conclude that Brar's consent was voluntary. Accordingly, we affirm the decision of the court of appeals.

## I.  BACKGROUND

¶4  A City of Middleton police officer stopped Brar for driving over the speed limit. During the stop, the officer conducted field sobriety tests, which Brar failed. Brar then submitted to a preliminary breath test and blew a .19. As a result, Brar was arrested.[4]

¶5  After arresting Brar, the officer transported him to the police department, where the officer read Brar the "informing the accused form." While being read the form, Brar repeatedly interrupted the officer with questions or comments related to the form. As part of "informing the accused" process, the officer asked Brar to submit to a chemical evidentiary test. The precise words Brar said in response are

---

[4] Brar does not contest the validity of the initial stop or his subsequent arrest.

disputed. However, the officer thought Brar provided an affirmative response, and therefore believed that Brar agreed to submit to a blood draw.

¶6 After agreeing to submit to an evidentiary test, Brar asked several questions. One of these questions was what kind of test would be conducted, and the officer responded he would conduct a blood draw. Brar then asked the officer if he needed a warrant to conduct a blood draw. In response to this question, the officer shook his head as if to respond no, indicating that he did not need a warrant.

¶7 Brar was taken to a hospital where his blood was drawn. The test results showed that Brar's blood alcohol content was .186, well above the legal limit to operate a vehicle. Brar was charged with operating while intoxicated, third offense in violation of Wis. Stat. § 346.63(1)(a) and operating a motor vehicle with a prohibited alcohol concentration in violation of § 346.63(1)(b).

¶8 Brar moved to suppress the results of the blood test. The circuit court held a hearing to determine whether Brar had consented to the blood draw.

¶9 At the hearing, the officer testified that Brar responded "of course" in response to the question "Will you submit to an evidentiary chemical test of your blood?" According to the officer, Brar then gave "a statement similar to he didn't want to have his license revoked." As a result, the officer believed that Brar had consented to the blood draw.

3

Moreover, the officer testified that Brar did not resist or hesitate to give blood once he was transported to the hospital.

¶10 The circuit court found that Brar had consented to a blood draw. The circuit court relied on the testimony of the officer, which the court found credible. And, the circuit court stated that nothing in the audiovisual recording was inconsistent with the officer's testimony; specifically, that the circuit court heard Brar say "of course," which corroborated the officer's testimony. For these reasons, the circuit court denied Brar's motion to suppress.[5] After the circuit court denied the motion, Brar entered a no contest plea to operating while intoxicated, third offense in violation of Wis. Stat. § 346.63(1)(a).

¶11 The court of appeals affirmed the circuit court's denial of Brar's motion to suppress. First, the court determined that the circuit court's finding that Brar consented to have his blood drawn was not clearly erroneous. Next, the court concluded that Brar's consent was voluntary. The court reasoned that the officer was correct in shaking his head no to indicate he did not need a warrant because Brar had already consented.

---

[5] Brar moved for reconsideration of the circuit court's denial of his motion to suppress after having the audiovisual recording of his interaction with the officer transcribed. Brar noted that the individual who transcribed the recording did not hear Brar say the words "of course." The circuit court concluded that Brar did not meet the criteria for a motion for reconsideration, and therefore denied the motion.

4

¶12 This court granted Brar's petition for review, and we affirm the court of appeals.

## II. DISCUSSION

### A. Standard of Review

¶13 "Whether a defendant has consented to a search is initially a question of historic fact." State v. Johnson, 2007 WI 32, ¶56, 299 Wis. 2d 675, 729 N.W.2d 182 (Roggensack, J., dissenting) (citation omitted). "We will uphold a circuit court's finding of historic fact unless it is clearly erroneous." Id. (citing State v. Sykes, 2005 WI 48, ¶12, 279 Wis. 2d 742, 695 N.W.2d 277). Next, we "independently apply the constitutional principles to the facts as found to determine whether the standard of voluntariness has been met." State v. Phillips, 218 Wis. 2d 180, 195, 577 N.W.2d 794 (1998).

¶14 In the present case, we apply this two-step test to determine if Brar voluntarily consented to a blood draw.

### B. Fourth Amendment, General Principles

¶15 "The Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution protect '[[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'"[6] State v. Tullberg, 2014 WI 134, ¶29, 359 Wis. 2d 421, 857 N.W.2d 120 (quoting State v. Robinson, 2010

---

[6] "Historically, we have interpreted Article I, Section 11 of the Wisconsin Constitution in accord with the Supreme Court's interpretation of the Fourth Amendment." State v. Arias, 2008 WI 84, ¶20, 311 Wis. 2d 358, 752 N.W.2d 748.

WI 80, ¶24, 327 Wis. 2d 302, 786 N.W.2d 463). "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." Florida v. Jimeno, 500 U.S. 248, 251 (1991) (citing Illinois v. Rodriguez, 497 U.S. 177 (1990)).

¶16 "A warrantless search is presumptively unreasonable." Tullberg, 359 Wis. 2d 421, ¶30 (quoting State v. Henderson, 2001 WI 97, ¶19, 245 Wis. 2d 345, 629 N.W.2d 613). "But there are certain 'specifically established and well-delineated' exceptions to the Fourth Amendment's warrant requirement."[7] State v. Williams, 2002 WI 94, ¶18, 255 Wis. 2d 1, 646 N.W.2d 834 (citing Katz v. United States, 389 U.S. 347, 357 (1967)). "One well-established exception to the warrant requirement of the Fourth Amendment is a search conducted pursuant to consent." Phillips, 218 Wis. 2d at 196. And, "it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." Jimeno, 500 U.S. at 250-51 (citing Schneckloth v. Bustamonte, 412 U.S. 281, 219 (1973).

¶17 It is well-established that consent "may be in the form of words, gesture, or conduct." Phillips, 218 Wis. 2d 180, ¶24; see also State v. Tomlinson, 2002 WI 91, ¶37, 254 Wis. 2d 502, 648 N.W.2d 367; United States v. Hylton, 349 F.3d 781, 786 (4th Cir. 2003) ("Consent may be inferred from actions

---

[7] "'[T]he taking of a blood sample . . . is a search' under the Fourth Amendment." State v. Kozel, 2017 WI 3, ¶40, 373 Wis. 2d 1, 889 N.W.2d 423.

6

as well as words."). Through conduct, an individual may impliedly consent to be searched. United States v. Lakoskey, 462 F.3d 965, 973 (8th Cir. 2006), as amended on reh'g (Oct. 31, 2006) ("Voluntary consent may be. . . implied."); United States v. Wilson, 914 F. Supp. 2d 550, 558 (S.D.N.Y. 2012) ("Consent may be granted either explicitly or implicitly." (citation omitted)); see also Morgan v. United States, 323 F.3d 776, 781 (9th Cir. 2003) (reasoning, "a warrantless search of a person seeking to enter a military base may be deemed reasonable based on the implied consent of the person searched"); State v. Hanson, 34 P.3d 1, 5 (Haw. 2001), as amended (Nov. 7, 2001) ("[E]ven in the absence of an express indication, implied consent to an airport security search may be imputed from posted notices.").

¶18 Consistent with these principles, "consent to a search need not be express but may be fairly inferred from context." Birchfield v. North Dakota, 136 S. Ct. 2160, 2185 (2016). Therefore, "a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'" United States v. Buettner-Janusch, 646 F.2d 759, 764 (2d Cir. 1981).

¶19 Prior cases from the court of appeals could be read as casting doubt on the maxim that a person may consent through conduct or by implication. For example, the court of appeals in Padley reasoned that consent that arises under Wisconsin's implied consent law is different from consent that is sufficient in and of itself under the Fourth Amendment. State v. Padley,

7

2014 WI App 65, ¶25, 354 Wis. 2d 545, 849 N.W.2d 867. Specifically, the court reasoned that "actual consent to a blood draw is not 'implied consent,' but rather a possible result of requiring the driver to choose whether to consent under the implied consent law." Id. This reasoning implies a distinction between implied consent and consent that is sufficient under the Fourth Amendment. Such a distinction is incorrect as a matter of law.[8]

¶20 Stated more fully, and contrary to the court of appeals' reasoning in Padley, consent can manifest itself in a number of ways, including through conduct. Cf. Florida v. Jardines, 133 S. Ct. 1409, 1415-16 (2013); Marshall v. Barlow's, Inc., 436 U.S. 307, 313 (1978). The use of the word "implied" in the idiom "implied consent" is merely descriptive of the way in which an individual gives consent. It is no less sufficient consent than consent given by other means.

¶21 An individual's consent given by virtue of driving on Wisconsin's roads, often referred to as implied consent, is one incarnation of consent by conduct. Wis. Stat. § 343.305(2) (An

---

[8] Of course, other constitutional rights may involve different considerations. For example, the United States Supreme Court reasoned: "There is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment. Nothing, either in the purposes behind requiring a 'knowing' and 'intelligent' waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures." Schneckloth v. Bustamonte, 412 U.S. 218, 241 (1973).

individual who "drives or operates a motor vehicle upon the public highways of this state . . . is deemed to have given consent to one or more tests of his or her breath, blood or urine."). "By reason of the implied consent law, a driver . . . consents to submit to the prescribed chemical tests."[9] State v. Neitzel, 95 Wis. 2d 191, 193, 289 N.W.2d 828 (1980); see also State v. Reitter, 227 Wis. 2d 213, 225, 595 N.W.2d 646 (1999) ("The implied consent law provides that Wisconsin drivers are deemed to have given implied consent to chemical testing as a condition of receiving the operating privilege."). And, as a plurality of the Supreme Court explained in Missouri v. McNeely, 133 S. Ct. 1552, 1566 (2013), "all 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense." The "consent" to which this court in Neitzel and the Supreme

---

[9] Our previous cases discussing implied consent clearly establish that an individual has already consented at the time an officer reads a driver the Informing the Accused form. See, e.g., State v. Neitzel, 95 Wis. 2d 191, 203, 289 N.W.2d 828 (1980) ("The entire tenor of the implied consent law is . . . that consent has already been given and cannot be withdrawn without the imposition of the legislatively imposed sanction of mandatory suspension."). "The specific objective of Wis. Stat. § 343.305(4) within the implied consent statutory scheme is to 'advise the accused about the nature of the driver's implied consent.'" State v. Piddington, 2001 WI 24, ¶17, 241 Wis. 2d 754, 623 N.W.2d 528 (quoting State v. Reitter, 227 Wis. 2d 213, 225, 595 N.W.2d 646 (1999)).

Court in McNeely refer is consent sufficient under the Fourth Amendment——not some amorphous, lesser form of consent. See, e.g., People v. Hyde, 393 P.3d 962, 968 (Colo. 2017) ("Hyde's statutory consent also satisfied the consent exception to the Fourth Amendment warrant requirement. This conclusion flows from recent Supreme Court precedent.").

¶22 Furthermore, the Supreme Court's assertion that an individual's consent to a search under the Fourth Amendment "may be fairly inferred from context" was given with specific reference to an implied consent law. Birchfield, 136 S. Ct. at 2185 (reasoning, "consent to a search need not be express but may be fairly inferred from context. . . . Our prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply."). Of course, the "context" to which the Supreme Court was referring was an individual driving on the roads of a state that had enacted an implied consent law.

¶23 Therefore, lest there be any doubt, consent by conduct or implication is constitutionally sufficient consent under the Fourth Amendment.[10] We reject the notion that implied consent is a lesser form of consent. Implied consent is not a second-tier form of consent; it is well-established that consent under the

---

[10] We do not address if there always must be an opportunity to withdraw consent before a blood draw is undertaken such as is currently provided in Wis. Stat. § 343.305(3).

10

Fourth Amendment can be implied through an individual's conduct.[11]

¶24 When we are asked to affirm a finding that consent was given, whether express or implied, we also must determine whether the consent was voluntary. See generally United States v. Griffin, 530 F.2d 739, 743 (7th Cir. 1976) ("Once the existence of a consent by conduct is determined, its voluntariness must be examined."). Only voluntarily given consent will pass constitutional muster. Schneckloth, 412 U.S. at 222. "Consent is not voluntary if the state proves 'no more than acquiescence to a claim of lawful authority,'" State v. Artic, 2010 WI 83, ¶32, 327 Wis. 2d 392, 786 N.W.2d 430 (quoting Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968)), or if the consent was the product of duress or coercion by law enforcement. Schneckloth, 412 U.S. at 227.

¶25 There is no single fact, the absence or presence of which, determines whether consent was voluntarily given. Id. at 226. Rather, in order to determine whether consent was voluntarily given, the totality of the circumstances of each individual case must be examined. Id. at 233. In examining the totality of the circumstances, "we look at the circumstances

---

[11] In the present case, Brar was conscious when he was read the Informing the Accused form. And, under Wisconsin's implied consent law, conscious drivers are statutorily given an opportunity to withdraw consent. However, individuals that choose to withdraw their consent are subject to penalties for withdrawing consent. Wis. Stat. § 343.305(9) & (10).

11

surrounding the consent and the characteristics of the defendant."[12]  Artic, 327 Wis. 2d 392, ¶33 (citing Phillips, 218 Wis. 2d at 197-98).  Even in implied consent cases, we consider the totality of the circumstances at the time of the blood draw to determine if an individual's previously-given consent continues to be voluntary at that time.

¶26 The State has the burden of proving that the consent was freely and voluntarily given.  Schneckloth, 412 U.S. at 222. However, the State need not demonstrate that consent was given knowingly or intelligently.  See id. at 241 ("Nothing, either in the purposes behind requiring a 'knowing' and 'intelligent' waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and

---

[12] As we explained in State v. Artic, 2010 WI 83, 327 Wis. 2d 392, 786 N.W.2d 430, we consider numerous factors to determine whether an individual voluntarily consented:

(1) whether the police used deception, trickery, or misrepresentation in their dialogue with the defendant to persuade him to consent; (2) whether the police threatened or physically intimidated the defendant or "punished" him by the deprivation of something like food or sleep; (3) whether the conditions attending the request to search were congenial, non-threatening, and cooperative, or the opposite; (4) how the defendant responded to the request to search; (5) what characteristics the defendant had as to age, intelligence, education, physical and emotional condition, and prior experience with the police; and (6) whether the police informed the defendant that he could refuse consent.

Id., ¶33.

seizures."); see also id. at 235 ("Our cases do not reflect an uncritical demand for a knowing and intelligent waiver in every situation where a person has failed to invoke a constitutional protection.").

¶27 Contrary to Supreme Court precedent, decisions from the court of appeals have required the State to prove consent was given knowingly and intelligently. See, e.g., Padley, 354 Wis. 2d 545, ¶64 (reasoning there must be "clear and positive evidence the search was the result of a free, intelligent, unequivocal and specific consent" (internal quotations omitted)); State v. Giebel, 2006 WI App 239, ¶12, 297 Wis. 2d 446, 724 N.W.2d 402; see also Neitzel, 95 Wis. 2d at 201. The Supreme Court in Schneckloth rejected precisely this requirement. As we interpret our constitution consistent with the Fourth Amendment, we withdraw any language from these cases that requires that consent to a search be given knowingly or intelligently.

## C. Application to Brar

¶28 In the present case, we must determine whether Brar consented, and if he did, whether his consent was voluntary.

¶29 First, Brar consented under Wisconsin's implied consent law. He availed himself of the roads of Wisconsin, and as a result, he consented through his conduct to a blood draw. Wisconsin Stat. § 343.305(2) (an individual who "drives or operates a motor vehicle upon the public highways of this state . . . is deemed to have given consent to one or more tests of his or her breath, blood or urine."). Any analysis of a

13

driver's consent under Wisconsin's implied consent law must begin with this presumption.

¶30 Aside from Brar's consent under the implied consent law, the circuit court found that Brar consented by his responses to the officer's questions.[13] The circuit court discussed an audiovisual recording of the officer's interaction with Brar as well as the officer's testimony. The evidence supports the circuit court's finding, and we conclude it was not clearly erroneous.

¶31 The officer testified that Brar responded "of course" in response to the question "Will you submit to an evidentiary chemical test of your blood?" According to the officer, Brar then gave "a statement similar to he didn't want to have his license revocated." As a result, the officer believed Brar affirmatively agreed to the blood draw.

¶32 The circuit court found the officer's "testimony to be credible, that Mr. Brar said, when asked more than once, the officer said I need to know, I need you to answer yes or no, will you submit to the test? Mr. Brar said, of course, he would submit. And the officer said that Mr. Brar said, because he didn't want to have his license revoked, or words to that effect." A circuit court's finding of fact that is based on the credibility of a witness is a persuasive factor in assessing whether the finding is clearly erroneous. See Wis. Stat.

---

[13] The circuit court stated: "I do find as a matter of fact that Mr. Brar did give consent."

14

§ 805.17(2) ("Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."). And, we have no reason to question the veracity of the officer's testimony in the present case.

¶33 Moreover, the circuit court found, and we agree, that the audiovisual recording of the interaction corroborates the testimony of the officer. Nothing in the recording rebuts the officer's testimony as to Brar's statements. Indeed, the officer's testimony that Brar said "of course" and then something to the effect of "I do not want my license revoked" is supported by the recording.

¶34 Accordingly, Brar first consented through his conduct; specifically, he consented by driving on the roads of Wisconsin. The circuit court found he later re-affirmed his consent when he was given the statutory opportunity to withdraw consent at the officer's reading of the Informing the Accused form to him. Based on the officer's testimony as corroborated by the recording of the officer's interaction with Brar, the circuit court's finding that Brar consented was not clearly erroneous.

¶35 Having concluded that Brar consented, we must determine whether his consent was voluntary. We conclude that Brar voluntarily, albeit impliedly, consented when he chose to drive on Wisconsin roads. And, his subsequent statement to the officer, re-affirming his previously-given consent was likewise voluntary. Brar does not argue otherwise; in essence, he

15

contends that the voluntariness of his consent dissipated sometime after he had already consented.

¶36 After consenting to the blood draw, Brar asked the officer if he needed to obtain a warrant to draw his blood. The officer shook his head no in response. However, the officer's response did not vitiate the voluntariness of Brar's consent.

¶37 After all, the officer did not need a warrant because Brar already had consented. And, the officer was not obligated to explain further than he did; for example, an individual need not be informed of the opportunity to withdraw consent under Wis. Stat. § 343.305(3) in order for consent to be voluntary. See Schneckloth, 412 U.S. at 229 (reasoning, that requiring the State to "affirmatively prove that the subject of the search knew that he had a right to refuse consent, would, in practice, create serious doubt whether consent searches could continue to be conducted"). Even if the import of Brar's question was unclear to the officer, "an officer need not clarify whether an ambiguous statement is meant to withdraw otherwise valid consent to search." See State v. Wantland, 2014 WI 58, ¶47, 355 Wis. 2d 135, 848 N.W.2d 810. Accordingly, the officer accurately responded to Brar's question and had no obligation to supply Brar with further information.

¶38 However, even if the officer's response to Brar's questions were unclear, it was insufficient to vitiate Brar's previously-given and subsequently re-affirmed voluntary consent. The voluntariness of consent is examined under the totality of the circumstances. And, the context in which Brar asked whether

16

the officer needed a warrant suggests that Brar voluntarily consented despite the arguably unclear nature of the officer's response. Brar's question about a warrant was not an isolated question; Brar asked the officer numerous questions throughout the encounter, many of which pertained to aspects of the Informing the Accused form. He also repeatedly lamented his guilt. In the context of his interaction with the officer, Brar's one question about the necessity of a warrant was insufficient to render his consent involuntary.

¶39 Moreover, Brar was informed of his opportunity to withdraw consent to a blood draw when the officer read him the Informing the Accused form. The officer asked him to provide a yes or no answer to the question of whether he would consent to a chemical evidentiary test. Earlier, the officer had explained the consequences of refusing a blood draw to Brar. As a result, Brar knew that he had the option of refusing a blood draw, yet he did not refuse. See United States v. Mendenhall, 446 U.S. 544, 559 (1980) (reasoning, "[because] the officers themselves informed the respondent that she was free to withhold her consent substantially lessened the probability that their conduct could reasonably have appeared to her to be coercive"). And, at no point did Brar as much as suggest an unwillingness to have his blood drawn.

¶40 Finally, Brar did not merely acquiesce to being searched. The cases in which courts have concluded consent was involuntary based on an individual's "mere acquiescence" are of no relevance to this case. "[A]cquiescence causes Fourth

17

Amendment problems when the acquiescence is made to claimed lawful authority to search, when no such lawful authority exists." Johnson, 299 Wis. 2d 675, ¶69 (Roggensack, J., dissenting) (citing Bumper, 391 U.S. at 548-49). Brar asked the officer a straightforward question: whether the officer needed a warrant to conduct a blood draw. The officer, at that point, answered the question accurately; he did not need a warrant because Brar had consented. In contrast to the cases in which courts have concluded an individual merely acquiesced to a search, the officer here did not assert that he would conduct a blood draw with or without Brar's consent. See Bumper, 391 U.S. at 548 ("The issue thus presented is whether a search can be justified as lawful on the basis of consent when that 'consent' has been given only after the official conducting the search has asserted that he possesses a warrant.").

¶41 In sum, Brar's "will was [not] overborne" by the officer. See Schneckloth, 412 U.S. at 226. After examining the totality of the circumstances, we conclude that Brar voluntarily consented to a blood draw.

### III. CONCLUSION

¶42 In light of the foregoing, we conclude that the circuit court's finding that Brar consented to the blood draw was not clearly erroneous. Additionally, we conclude that Brar's consent was voluntary. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶43 REBECCA GRASSL BRADLEY, J. *(concurring).* I concur with the court's mandate to affirm the decision of the court of appeals, and I join Part I of Justice Daniel Kelly's concurrence.

¶44 DANIEL KELLY, J. *(concurring).* I join the court's mandate and the opinion to the extent it discusses Mr. Brar's express consent to the blood test while he was present in the police station. I cannot join any part of the court's discussion of implied consent because it misunderstands how our implied consent law functions, it says "consent" implied by law is something voluntarily given when such a thing is impossible, it introduces a destructive new doctrine that reduces constitutional guarantees to a matter of legislative grace, and it fails to properly distinguish between (a) express consent, (b) consent implied by conduct, and (c) "consent" implied by law. And all of this was entirely gratuitous——as the court's own opinion demonstrates, implied consent need have no part in our resolution of the case. Because this last point describes where the court's opinion should have ended, I will begin there.

I

¶45 There was no need to march into the minefield of "consent" implied by law.[1] Mr. Brar asked us to review his conviction for two reasons. First, he says he did not give express consent to chemical testing of his blood. And second, he says he only acquiesced to the blood test because Officer Michael Wood said he did not need a warrant to obtain a blood

---

[1] When speaking of the implied consent provided by Wis. Stat. § 343.305(2), I will refer to "'consent' implied by law." I do this to distinguish it from consent implied by conduct. And I put "consent" in quotes because, as I discuss <u>infra</u>, "consent" implied by law is not actually consent at all, and is incapable of authorizing a law enforcement officer to perform a blood test.

sample. The presenting questions, therefore, called for us to review what Mr. Brar said and——if it amounted to express consent——determine whether his consent was voluntary. State v. Artic, 2010 WI 83, ¶30, 327 Wis. 2d 392, 786 N.W.2d 430 ("To determine if the consent exception is satisfied, we review, first, whether consent was given in fact by words, gestures, or conduct; and, second whether the consent given was voluntary.").

¶46 We are not considering Mr. Brar's interaction with Officer Wood in the first instance, of course. We are reviewing the circuit court's findings of fact, which we leave undisturbed unless they are clearly erroneous. Phelps v. Physicians Ins. Co. of Wis., Inc., 2009 WI 74, ¶34, 319 Wis. 2d 1, 768 N.W.2d 615. According to the circuit court, Officer Wood asked Mr. Brar whether he would submit to an evidentiary chemical test of his blood. The record reflects that Mr. Brar said "of course," and that he didn't want to lose his driving privileges. Our review revealed nothing clearly erroneous about the circuit court's findings, and so we accepted that Mr. Brar expressly consented to a blood test.

¶47 We promptly, and properly, dispatched Mr. Brar's argument that his consent was not voluntary. According to Mr. Brar, when Officer Wood told him he did not need a warrant to conduct the blood test, he made a misrepresentation of law sufficient to negate the voluntariness of his consent. But Officer Wood's statement came after Mr. Brar's consent, which made his statement correct——he didn't need a warrant because Mr. Brar had consented to the search. See Artic, 327 Wis. 2d 392,

2

¶29 (One well-established exception to the warrant requirement is a search conducted pursuant to consent.). Thus, there was no misrepresentation to cast doubt on the voluntariness of Mr. Brar's consent. Mr. Brar did not argue his consent was involuntary for any other reason, so we properly concluded his consent was constitutionally valid.

¶48 That should have been the end of our opinion. Traditionally, when the presenting questions resolve the matter, we declare our treatment of the case complete at that point. See Black v. City of Milwaukee, 2016 WI 47, ¶39 n.24, 369 Wis. 2d 272, 882 N.W.2d 333, cert. denied sub nom. Milwaukee Police Ass'n v. City of Milwaukee, 137 S. Ct. 538 (2016) ("We do not address these issues because they are not necessary to resolve this case"); see also State v. Cain, 2012 WI 68, ¶37 n.11, 342 Wis. 2d 1, 816 N.W.2d 177 ("[A]n appellate court should decide cases on the narrowest possible grounds." (quoting Md. Arms Ltd. P'ship v. Connell, 2010 WI 64, ¶48, 326 Wis.2d 300, 786 N.W.2d 15)); Hull v. State Farm Mut. Auto. Ins. Co., 222 Wis. 2d 627, 640 n.7, 586 N.W.2d 863 (1998) ("As a general rule, when our resolution of one issue disposes of a case, we will not address additional issues."). Experience has taught us it is usually wise to leave peripheral questions to a future case in which they return as dispositive issues. There are good reasons to honor that experience. The process of reasoning from premises to conclusion imposes a rigorous discipline on our research, deliberation, and analysis that is absent when we opine on matters beyond those necessary to our

judgment. The court's opinion validates the wisdom of our tradition.

II

¶49 Not only did we boldly march into the "implied consent" minefield, we did it blindfolded. Our implied consent statute, Wis. Stat. § 343.305 (2013-14),[2] is not a model of clarity. That should have driven us to a searching, wide-eyed perusal of the statute's language to help us through this fraught territory. Instead, with the benefit of just three cursory sentences addressing the statute's terms, we announced that it provides a real-life, constitutionally-sufficient, consent to a blood test: "Brar consented under Wisconsin's implied consent law. He availed himself of the roads of Wisconsin, and as a result, he consented through his conduct to a blood draw." Majority op., ¶29. That, however, is not what the statute does.

¶50 The question the court answered, but did not analyze, is whether "implied consent" actually authorizes a law enforcement officer to obtain a sample of a driver's blood. To discover whether it does, we must consider three of the statute's functional components. The first addresses itself to its eponymous subject——"consent" implied by law (I will call this the "Implied Consent Component"). Wis. Stat. § 343.305(2). The second component governs a law enforcement officer's request for a blood test (the "Test Authorization Component"). Wis.

_____

[2] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

Stat. § 343.305(3)-(4).[3]  The third covers the consequences for refusing an officer's request for a test (the "Penalty Component").  Wis. Stat. § 343.305(9)-(10).  With but one exception that is not relevant here, there is no operational connection between the Implied Consent Component and the Test Authorization Component.[4]

¶51 By its own terms, the Implied Consent Component isolates itself from the authorization the State must obtain to collect a sample of the driver's blood.  In relevant part, it says this:

> Implied Consent.  Any person who . . . drives or operates a motor vehicle upon the public highways of this state . . . is deemed to have given consent to one or more tests of his or her breath, blood or urine, for the purpose of determining the presence or quantity in his or her blood or breath, of alcohol . . . when <u>requested</u> to do so by a law enforcement officer under sub. (3)(a) or (am) or when required to do so under sub. (3)(ar) or (b).  Any such tests shall be administered upon the <u>request</u> of a law enforcement officer.

Wis. Stat. § 343.305(2) (emphases added).  This provision creates the "implied consent," but it simultaneously forecasts its operational independence from the Test Authorization

---

[3] The statute also provides for tests of a driver's breath or urine.  But because a blood test is at issue in this case, I will refer only to that type of test.

[4] There is a connection between the Implied Consent Component and Test Authorization Component when the driver is unconscious.  Wis. Stat. § 343.304(3)(b).  That exception presents issues distinct from those presented by conscious drivers.  Because Mr. Brar was conscious, I do not address the exception here.

Component: Operating a motor vehicle gives rise to "deemed" consent, but the actual blood test must be <u>requested</u> by the law enforcement officer.[5]

¶52 What the Implied Consent Component forecasts, the Test Authorization Component makes explicit——the officer must ask the driver for permission to conduct a blood test: "Upon arrest of a person for [operating while intoxicated] . . . a law enforcement officer may <u>request</u> the person to provide one or more samples of his or her breath, blood or urine for the purpose specified under sub. (2)." Wis. Stat. § 343.305(3)(a) (emphasis added). When an officer asks a driver for permission to conduct a test, he must recite a very specific warning. The provision introducing the warning echoes the fact that he is asking permission——not telling: "At the time that a chemical test specimen <u>is requested</u> under sub. (3) (a), (am), or (ar), the law enforcement officer shall read the following to the person from whom the test specimen <u>is requested</u> . . . ." Wis. Stat. § 343.305(4) (emphases added). The statutorily-mandated warning confirms the officer is asking permission, and the driver may say "no" to the officer's request:

> You have either been arrested for an offense that involves driving or operating a motor vehicle while under the influence of alcohol or drugs, or both, or you are the operator of a vehicle that was involved in an accident that caused the death of, great bodily harm to, or substantial bodily harm to a person, or you are suspected of driving or being on duty time

---

[5]This subsection also provides for a "required" test when the operator is unconscious. But that is part of the exception I mentioned above. See <u>supra</u> n.4.

with respect to a commercial motor vehicle after consuming an intoxicating beverage.

This law enforcement agency now <u>wants</u> to test one or more samples of your breath, blood or urine to determine the concentration of alcohol or drugs in your system. If any test shows more alcohol in your system than the law permits while driving, your operating privilege will be suspended. <u>If you refuse</u> to take any test that this agency <u>requests</u>, your operating privilege will be revoked and you will be subject to other penalties. The test results or the fact that you refused testing can be used against you in court.

<u>If you take</u> all the requested tests, you may choose to take further tests. You may take the alternative test that this law enforcement agency provides free of charge. You also may have a test conducted by a qualified person of your choice at your expense. You, however, will have to make your own arrangements for that test.

If you have a commercial driver license or were operating a commercial motor vehicle, other consequences may result from positive test results or from <u>refusing testing</u>, such as being placed out of service or disqualified.

Wis. Stat. § 343.305(4) (emphases added).

¶53 I'm not going to pretend the meaning of "request" is an open question. We are all fluent English-speakers here, and we know it means what it so obviously does——it is a question, a seeking of an answer. And when the request is for a blood sample, we know the officer is asking permission to take it. I suppose someone might say the statute's repeated admonition that the officer must seek permission to take a sample is a tip of the hat to good manners. I trust the government's agents make every effort to be polite in their interactions with Wisconsin's residents, so this would be a frivolous mandate to write into a statute. Absent any textual hints that the repeated "request"

7

requirement is more about etiquette than a mandate to ask permission, we shouldn't read it that way. See State ex rel. Kalal v. Cir. Ct. for Dane Cty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 ([S]tatutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.'" (quoting Seider v. O'Connell, 2000 WI 76, ¶43, 236 Wis. 2d 211, 612 N.W.2d 659)).

¶54 So what does that mean for "implied consent"? It is axiomatic that if one must ask for something, then one doesn't yet have it. If the statute's "implied consent" really is equal to a driver's voluntarily and freely given consent (as the court claims), then all of this "request" business is so much doubletalk. If the court is right, then there is no need to ask because the law says we may act as though the driver already said "yes." So Wis. Stat. § 343.305(3)(a) would read: "Upon arrest of a person for [operating while intoxicated] . . . a law enforcement officer may ~~request~~ <u>tell</u> the person to provide one or more samples of his or her breath, blood or urine for the purpose specified under sub. (2)." And § 343.305(4) would have to read: "At the time that a <u>driver is told to provide a</u> chemical test specimen ~~is requested~~ under sub. (3) (a), (am), or (ar), the law enforcement officer shall read the following to the person <u>told to provide a</u> ~~from whom the~~ test specimen ~~is requested~~ . . . ." The warning required by § 343.305(4) would need to be similarly amended to remove the "request" language, as well as the confirmation that the subject can tell the officer "no." But the officer <u>does</u> have to ask permission, and

8

the driver may indeed refuse his request.  And that means "implied consent" and the consent actually necessary to obtain the blood sample are quite obviously not the same thing, and do not serve the same function.

¶55  "Implied consent" does, however, have a purpose.  And that purpose is to juke the Fourth Amendment.  We know that taking a blood sample in the absence of a warrant or exigent circumstances is an unconstitutional search.  Birchfield v. North Dakota, 579 U.S. ___, 136 S. Ct. 2160, 2173 (2016) ("The Amendment thus prohibits "unreasonable searches," and our cases establish that the taking of a blood sample or the administration of a breath test is a search.").  So, contrary to what our opinion says today, the legislature cannot simply authorize police officers to take blood samples without asking permission.[6]  Thus, "implied consent" cannot be the same thing as consent given pursuant to a police officer's request.  And indeed it is not.

¶56  "Implied consent" has an entirely different function. It is part of a mechanism designed to obtain indirectly what it

---

[6] Birchfield arose in the context of an implied consent statute (actually, several implied consent statutes, inasmuch as this opinion addressed defendants from multiple states).  See Birchfield v. North Dakota, 579 U.S. ___, 136 S. Ct. 2160, 2173 (2016).  So if the legislatively-provided consent was sufficient to authorize a blood test, the Court would not have spent any time determining whether such tests are appropriate under the "search incident to arrest" exception to the Fourth Amendment. It would have simply noted the existence of an implied consent statute and called it a day.  But it didn't, so apparently the United States Supreme Court is not willing to trim the Fourth Amendment's protections as aggressively as we are.

9

cannot (and does not) create directly——consent to a blood test. The Implied Consent Component works in tandem with the Penalty Component to cajole drivers into giving the real consent required by the Test Authorization Component. The Penalty Component punishes a driver by revoking his operating privileges if he refuses an officer's request for a blood sample. Wis. Stat. § 343.305(9)-(10). But that smacks of punishing someone for the exercise of his constitutional right to be free of unreasonable searches, upon which we generally frown. Harman v. Forssenius, 380 U.S. 528, 540 (1965) ("It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution.").

¶57 It is this consideration that, finally, explains why the Implied Consent Component exists and where it slips into place. The idea appears to be that if the driver's Fourth Amendment rights have been legislatively waived, there can be no punishment consequent upon the exercise of a constitutional right because it has already been relinquished, courtesy of Wis. Stat. § 343.305(2). Thus, when a driver refuses to provide a blood sample, he is not being punished for exercising a constitutional right, but for refusing a statutorily-authorized request for needed evidence. This Rube Goldberg-like convolution may or may not be sufficient to make it past the Fourth Amendment, but the purpose of my concurrence is not to analyze this contraption's fidelity to the Constitution. My purpose here is only to describe how the statute functions, and

10

explain why "implied consent" has nothing to do with the consent necessary to obtain a blood sample.

¶58 In sum, the court's opinion misstates how Wis. Stat. § 343.305 operates. "Implied consent" does not authorize an officer to take a blood sample. It only provides (questionable) cover for punishing a driver who refuses to authorize a blood test. To actually perform the test, the officer has to ask the driver's permission. And if the driver says "no," the "implied consent" provision does not step in to countermand his answer. So the court erred by imputing to this statutorily-deemed "consent" the power to authorize a blood test. It then built on that error by claiming this non-operational "consent" is constitutionally valid because it is given freely and voluntarily.

III

¶59 It is a metaphysical impossibility for a driver to freely and voluntarily give "consent" implied by law. This is necessarily so because "consent" implied by law isn't given by the driver. If it is given by anyone, it is given by the legislature through the legal fiction of "deeming": "Any person who . . . drives or operates a motor vehicle upon the public highways of this state . . . is deemed to have given consent . . . ." Wis. Stat. § 343.305(2). One only "deems" when the thing deemed did not really happen, but you intend to act as though it did. So it makes no sense to ask if the driver freely and voluntarily gave something he manifestly did not give in the first place.

11

¶60 And yet, the court asks anyway: "When we are asked to affirm a finding that consent was given, whether express or implied, we also must determine whether the consent was voluntary." Majority op., ¶24 (emphasis added). It is true that a person's consent to a search is constitutionally valid only if he gives it freely and voluntarily.[7] However, even as the court asserts that express consent and "consent" implied by law are constitutionally fungible, its analysis proves its thesis is indefensible. A brief exploration of how we assay the voluntariness of a person's consent illustrates the meaninglessness of this standard in the context of "consent" implied by law.

¶61 We analyze a wealth of factors in determining whether an expression of consent meets the voluntariness standard. Majority op., ¶¶24-26. We ask, for example, whether the police used deception, or trickery, or misrepresentations to produce the consent. Artic, 327 Wis. 2d 392, ¶33. We explore whether the authorities threatened the defendant. Id. Or intimidated him. Id. Or used food or sleep as leverage to prize out his consent. Id. We ask whether the officer and the circumstances were "congenial, non-threatening, and cooperative." Id. We want to know how the defendant responded to the search request. Id. We factor into our analysis the person's age. Id. And intelligence. Id. And education. Id. And his physical and

---

[7] See State v. Artic, 2010 WI 83, ¶32, 327 Wis. 2d 392, 786 N.W.2d 430 ("The State bears the burden of proving that consent was given freely and voluntarily.").

12

emotional condition. Id. And whether he had prior experience with law enforcement. Id. And whether the police told him he need not consent. Id. This is, in full, an exhaustive inquiry into virtually every conceivable circumstance that could possibly have some bearing on whether the defendant's consent was the product of the State's influence, as opposed to the defendant's own will.

¶62 And still we are not done. A defendant may have said "yes," and he may have actually submitted to the search, but we still worry that his words and his conduct might not really reflect a free and voluntary expression of his will. So we say that just because a person acquiesces to a search doesn't mean that he was really consenting. "Consent is not voluntary if the state proves 'no more than acquiescence to a claim of lawful authority.'" Id., ¶32 (quoting Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968)).

¶63 Now we are almost done determining whether a person's express consent is enough to waive his Fourth Amendment rights. To ward against inadvertent waivers, we burden the State with the obligation to prove the consent was voluntarily and freely given. Id. All told, then, we test the sufficiency of express consent with a searching inquiry into everything that could have made the consent anything less than a product of the driver's uninhibited will, we disregard a person's actual submission to the search if it was nothing more than acquiescence to a claim of lawful authority, and we make it the State's responsibility to prove the driver gave his consent freely and voluntarily. So

13

much for express consent; now it's time to look at the factors we use to determine whether an instance of "consent" implied by law meets this standard.

¶64 For "consent" implied by law, we ask whether the driver drove his car.

¶65 And that's it. If the court is right about "consent" implied by law, then we have no interest in what the driver said, thought, experienced, felt, or saw. Nor do we need consider whether the driver acquiesced to a police officer's claim of lawful authority. We aren't interested in any personal detail about the driver, such as his age, intelligence, circumstances, or emotional state. The only thing we want to know is whether he was in the driver's seat. And that's exactly what the court said: "We conclude that Brar voluntarily, albeit impliedly, consented when he chose to drive on Wisconsin roads."

¶66 That single sentence comprises the entirety of the court's voluntariness analysis as it relates to "consent" implied by law. In truth, that's about as much as it could possibly have said because we really aren't interested in the driver at all when it comes to this type of consent. The driver is irrelevant to the question because he isn't the one who provided the consent——it was the legislature. If the driver drove, the consent inquiry ends before it begins because the legislature provided it 48 years ago when it adopted Wis. Stat. § 343.305. There is a vast chasm separating express consent from "consent" implied by law, as this brief diversion into the voluntariness standard illustrates. In reality, they have

14

literally nothing in common. Which is understandable because, as discussed above, they perform entirely different functions.

IV

¶67 The most likely reason the court fell into error is that it tangled up the concepts of express consent (that is, spoken or written consent), consent implied by conduct, and "consent" implied by law. If we could untie this knot and consider the nature and function of each concept independently of the others, I believe the errors would correct themselves.

¶68 The first step to untying a knot is carefully observing how it came to be. I begin, therefore, by identifying each time the court confounded the different types of consent. The knot began with the threads of express consent and "consent" implied by law, which the court started weaving together in its discussion of State v. Padley, 2014 WI App 65, 354 Wis. 2d 545, 849 N.W.2d 867. See Majority op., ¶¶19-20. Rejecting the court of appeals' proper attempt to keep the threads separate, the court twisted them together into one: "This reasoning implies a distinction between implied consent and consent that is sufficient under the Fourth Amendment. Such a distinction is incorrect as a matter of law." Majority op., ¶19 ("Statement 1"). Still responding to Padley, the court then introduced the thread of consent implied by conduct into the growing knot: "Stated more fully, and contrary to the court of appeals' reasoning in Padley, consent can manifest itself in a number of ways, including through conduct." Majority op., ¶20 ("Statement 2"). Express consent, of course, is something personal to the

15

driver (as opposed to something "deemed" by the legislature), so the court's next step was to infuse the personal "granting" element of express consent into each of the other threads: "The use of the word 'implied' in the idiom 'implied consent' is merely descriptive of the way in which an individual gives consent. It is no less sufficient consent than consent given by other means." Id. ("Statement 3"). It then subsumed "consent" implied by law into consent implied by conduct by making the former just a particular manifestation of the latter: "An individual's consent given by virtue of driving on Wisconsin's roads, often referred to as implied consent, is one incarnation of consent by conduct." Id., ¶21 ("Statement 4"). Finally, it pointed to the knot and declared it was all one, and the one was sufficient to waive Fourth Amendment protections:

> Therefore, lest there be any doubt, consent by conduct or implication is constitutionally sufficient consent under the Fourth Amendment. We reject the notion that implied consent is a lesser form of consent. Implied consent is not a second-tier form of consent; it is well-established that consent under the Fourth Amendment can be implied through an individual's conduct.

Id., ¶23 ("Statement 5"). But it is not all one.

¶69 The second step to the untying project is disentangling express consent from "consent" implied by law. I have already done most of the foundational work (supra), and it appears this is the loosest strand in the weave. I will pull first on Statement 3: "The use of the word 'implied' in the idiom 'implied consent' is merely descriptive of the way in which an individual gives consent. It is no less sufficient

16

consent than consent given by other means." The premise of this statement is that, whether we are considering express consent or "consent" implied by law, it is the driver giving consent. That, however, is not true——between the two, only the first comes from the driver. Which is why we pay such fastidious attention to him and the circumstances of his interaction with the police officer when we assay the voluntariness of his consent. But with "consent" implied by law, we give scant thought to the driver (as the court itself demonstrated) because he isn't the one who gives the consent; it is the legislature. So it is categorically untrue that "the word 'implied' in the idiom 'implied consent' is merely descriptive of the way in which an individual gives consent." The word "implied" is important because it tells us it is the legislature, not the individual, who is giving consent.

¶70 With that correction, express consent is almost free from the court's knot. It is held there only by the court's rebuke in Statement 1: Padley's "reasoning implies a distinction between implied consent and consent that is sufficient under the Fourth Amendment. Such a distinction is incorrect as a matter of law." The implied consent statute actually makes Padley's distinction explicit. As described above, the Implied Consent Component will never result in authorization to perform a blood test on a conscious individual because there is no operational connection between it and the Test Authorization Component. A police officer must ask a driver's permission to conduct a blood test; the statute's

17

"implied consent" cannot supply that authorization, nor was it designed to do so. Thus, the court's statement that the "distinction is incorrect as a matter of law" is itself incorrect as a matter of law. And with that, express consent is free of the knot.

¶71 The third step in untying the knot is separating consent implied by conduct from "consent" implied by law. The court's discussion bounced between the two as if they were the same thing. They are not. Consent implied by conduct is a recognition of how people interact with each other in real life. Sometimes an action, or a gesture, or a circumstance, is sufficiently expressive of a person's will that we can derive from that conduct definite and certain information. And when that information conveys consent to a search, we accept it for its intended meaning, so long as it meets the voluntariness standard. These principles are apparent from the very cases the court cited while muddling the two concepts. I will address enough of them to demonstrate there is a real and critical difference between the concepts.

¶72 The court referred to State v. Tomlinson, in which we considered whether officers had received consent to enter a person's home. 2002 WI 91, 254 Wis. 2d 502, 648 N.W.2d 367. Two police officers approached the back door and knocked. A teenage girl answered, and the police informed her they were searching for the defendant and requested permission to enter. She then "turned to enter the house upon the officer's request to enter." Id., ¶37. We noted that the defendant "was present

18

and apparently said nothing when this occurred." Id. We concluded that this conduct "could reasonably have been interpreted as an invitation to follow her inside." Id. That is, we carefully examined the conduct of the girl and the defendant to deduce what information it was conveying to the officers standing at the door. Because the conduct sufficiently conveyed a message of consent to the officers' entry, we gave it that effect and confirmed the search's constitutionality.

¶73 The court also cited United States v. Lakoskey, 462 F.3d 965 (8th Cir. 2006), as amended on reh'g (Oct. 31, 2006), which provides a counterfactual illustration of consent implied by conduct. There, a postal inspector was suspicious of a package, and so delivered it personally to the addressee. Id. at 968. The inspector met Mr. Lakoskey just outside the front door, and handed him the package. Id. When the inspector asked to see what was in the package, Mr. Lakoskey refused and walked inside the house. Id. After repeated requests, Mr. Lakoskey finally said he would open the package, but then turned so the inspector could not see it. Id. at 969. At that point, the inspector entered the house, Mr. Lakoskey opened the envelope, and incriminating evidence was disclosed. Id. The question before the court was whether Mr. Lakoskey's actions could reasonably convey the message "you may enter my home" to the inspector. The district court said yes. Id. at 971. The Eight Circuit disagreed. While recognizing that consent to a search can be implied from conduct, the court observed that "there is no indication in the record that he [Thomas Lakoskey] invited

19

[Inspector] Hirose's entry, came outside to tell Hirose to follow him, left his door open, or motioned for Hirose to come in, implying that Hirose should follow him." Id. at 974. So the court concluded that "the finding of the district court that Thomas [Lakoskey]'s actions constituted implied consent for Hirose to enter his home was clearly erroneous." Id.

¶74 The court also relied on Morgan v. United States, 323 F.3d 776, 778 (9th Cir. 2003), which held that "a warrantless search of a person seeking to enter a military base may be deemed reasonable based on the implied consent of the person searched." The Morgan court relied heavily on a Fourth Circuit case, which described how a person's conduct in such circumstances can convey the message "I consent to being searched":

> [T]he validity of [the defendant's] search [did not] turn on whether he gave his express consent to search as a condition of entering the base. Consent is implied by the totality of all the circumstances. The barbed-wire fence, the security guards at the gate, the sign warning of the possibility of search, and a civilian's common-sense awareness of the nature of a military base—all these circumstances combine to puncture any reasonable expectations of privacy for a civilian who enters a closed military base.

Id., 781-82. (quoting United States v. Jenkins, 986 F.2d 76, 79 (4th Cir. 1993)).

¶75 Handing over one's luggage to be put through an x-ray scanner at an airport is also conduct conveying consent to a search, according to State v. Hanson, 34 P.3d 1, 5 (Haw. 2001), as amended (Nov. 7, 2001) ("Plainly, the surrender of one's effects at airport security checkpoints is to allow inspection

20

of such effects for contents that may pose a danger to those on the aircraft."). And when an officer asks to search a bedroom, the meaning of the defendant's resulting conduct cannot be mistaken when he "opened the door to and walked into his bedroom, retrieved a small baggie of marijuana, handed the baggie to the agents, and pointed out a number of drug paraphernalia items." State v. Phillips, 218 Wis. 2d 180, 197, 577 N.W.2d 794 (1998). We concluded the obvious: "The defendant's conduct provides a sufficient basis on which to find that the defendant consented to the search of his bedroom." Id. The court relied on both of these cases, too, and yet still did not perceive the difference between consent implied by conduct and "consent" implied by law.

¶76 There is a commonality to each of these cases, and indeed to all cases that find consent in a person's conduct: the information-conveying dynamic inherent to a game of Charades. When a defendant is supposed to have manifested his consent to a search by his conduct, we carefully watch as the State recreates the interaction between the officer and defendant. If the defendant's conduct in response to the request conveys the message "I agree to be searched," we give it that effect. There is no "deeming" involved. Just as in a game of Charades, we are trying to understand the actual, real-life information the person is conveying through his conduct at that moment.

¶77 And that unties the rest of the court's knot. In Statement 4 the court said "consent" implied by law is just a

21

type of consent implied by conduct: "An individual's consent given by virtue of driving on Wisconsin's roads, often referred to as implied consent, is one incarnation of consent by conduct." If that is true, then there should be enough information bundled up in the act of "driving on Wisconsin's roads" for us to deduce an expression of the driver's will from that conduct.

¶78 Except there is not. There are a million things we might imagine driving a car might mean, very few that we can discern with any certainty, and none that say anything about consent to a search. We might conclude from observing a driver on the interstate that he is traveling from point A to point B. But even that simple inference is entirely speculative. Maybe he's out for a Sunday drive and he's travelling from Point A back to Point A. If he's traveling quickly we might infer he is in a hurry to get to his destination. But then again, maybe he just likes to drive fast. One could multiply examples without end, but in the end it would just emphasize what we already know. And that is that there are only two things we can confidently say that driving a car on Wisconsin's roads means: The driver is driving his car, and he is in Wisconsin. In a thousand attempts in a thousand games of Charades, no contestant will ever guess that driving a car in Wisconsin means "I consent to a blood test." It does no good to say the driver expresses such consent because the statute says he does. If one must resort to the statute books to discover the meaning of the driver's conduct, then the conduct has utterly failed to convey

22

that meaning. Which is not at all surprising because the statute does not purport to describe the <u>meaning</u> of driving on Wisconsin's roads, only its <u>consequences</u>.

¶79 Thus, neither the driver's conduct nor the statute can make driving in Wisconsin mean "I consent to a blood test." And that necessarily means that "consent" implied by law is <u>not</u> "one incarnation of consent by conduct." It then follows that Statement 2——in which the court said consent can be derived from conduct——is true as a standalone description of the law, but irrelevant because this is not a "consent implied by conduct" case. Most of Statement 5 is true but irrelevant for the same reason——to the extent it says consent implied by conduct can be constitutionally sufficient, it is saying something inapplicable to this case.

¶80 Untying the knot isolates the court's error. In Statement 5, the court said "lest there be any doubt, consent by . . . implication is constitutionally sufficient consent under the Fourth Amendment." But without any support from the text of the statute, or the "consent by conduct" or "express consent" lines of cases, the statement is just <u>ipse dixit</u>. It is so because we say it is. And that contributes to an even more significant problem.

V

¶81 When the court says "consent" implied by law is just as constitutionally effective as express consent, it is saying something terribly chilling. It is saying the legislature may decide when the people of Wisconsin must surrender their

23

constitutional rights. The court recognized that conducting a blood test constitutes a search within the meaning of the Fourth Amendment. It also recognized that such searches require a warrant or a legitimate exception to the Fourth Amendment. And it further recognized that the exceptions usually will not apply.[8] The court dispensed with all of this, and announced that blood tests are always available when there is probable cause to believe someone was driving in Wisconsin while intoxicated. The scythe sharp enough to cut through all of these limitations turned out to be really quite simple, but no less surprising for that. The legislature simply had to declare that the people of Wisconsin had agreed to it.

¶82 If this is right, the Birchfield and McNeely[9] courts should probably feel a little sheepish for all the attention they paid to the constitutional niceties. Especially the Birchfield court, which lauded implied consent laws, but somehow missed our insight that they dispense with both the warrant requirement and the need to consider the known exceptions to the Fourth Amendment. "Consent" implied by law, our court says today, is no "second-tier form of consent." It is "constitutionally sufficient consent under the Fourth Amendment." The legislature need only say the people of

---

[8] I am quite sure the court recognizes the limitations. It cited both McNeely and Birchfield, which together place substantial restrictions on when an officer may conduct a blood test without a warrant or consent.

[9] Missouri v. McNeely, 569 U.S. ___, 133 S. Ct. 1552 (2013).

24

Wisconsin waive their Fourth Amendment rights by driving, and immediately it is so.

¶83 A constitutional doctrine of this magnitude deserves considerably more attention than today's opinion gives it. One aspect of a more rigorous consideration would include developing and describing some limiting principles. Today the court says the legislature properly suspended Wisconsinites' Fourth Amendment rights when they go for a drive. What of their Sixth Amendment rights? Perhaps the legislature might decide it would be easier to get convictions if they also suspend the right to the effective assistance of counsel. According to our opinion today, the legislature could simply declare that driving in Wisconsin waives that right, too. Or the right not to incriminate oneself. Or the right to a jury. What principle, exactly, would prevent any of this?

¶84 Nor is there anything about this new doctrine that necessarily limits it to the context of obtaining blood tests from intoxicated drivers. There are certain parts of the State that experience a disproportionate amount of crime. Perhaps the legislature might decide police need greater access to homes and other buildings in such areas. It could, according to our opinion today, adopt an "implied consent" statute in which recording a property deed comprises consent to a search of one's property when the police have probable cause to believe the owner has been involved in a crime. It takes very little imagination to see how this new doctrine could eat its way through all of our constitutional rights.

25

¶85 I understand the importance of pursuing intoxicated drivers. But we are deforming our Constitution. By conferring on the legislature the authority to create consent where none exists, we are reducing constitutional rights to matters of legislative grace. For all of these reasons, I join the court's mandate, but only so much of the opinion as discusses express consent.

¶86 I am authorized to state that Justice REBECCA GRASSL BRADLEY joins part I of this concurrence.

¶87 SHIRLEY S. ABRAHAMSON, J. *(dissenting)*.[1] The legal principle underlying this drunk-driving case is that a blood draw is a search under the Fourth Amendment.[2]

---

[1] The first opinion, authored by Chief Justice Patience D. Roggensack, is a lead opinion. The opinion is referred to as a lead opinion because it states the mandate agreed to by the majority of the justices but represents the reasoning of less than a majority of the participating justices.

Only Justice Annette K. Ziegler and Justice Michael J. Gableman join the lead opinion.

Writing in concurrence, Justice Rebecca G. Bradley concurs with the mandate and joins Part I of Justice Daniel Kelly's concurrence. Justice Daniel Kelly joins the "court's mandate and the opinion to the extent it discusses Mr. Brar's express consent to the blood test while he was present in the police station," but does not "join any part of the court's discussion of implied consent . . . ." Justice Kelly's opinion, ¶1.

Thus five justices agree with the mandate set forth in the lead opinion; the mandate is that the decision of the court of appeals is affirmed.

Disagreeing with the mandate and the reasoning of the lead opinion, I write in dissent, joined by Justice Ann Walsh Bradley.

As Justice Ann Walsh Bradley recently explained in State v. Weber, 2016 WI 96, ¶83 n.1, 372 Wis. 2d 202, 887 N.W.2d 554 (Ann Walsh Bradley, J., dissenting), although "the term 'lead' opinion . . . is undefined in our Internal Operating Procedures, its use here is consistent with past description. We have said 'that a lead opinion is one that states (and agrees with) the mandate of a majority of the justices, but represents the reasoning of less than a majority of the participating justices.'" (quoting State v. Lynch, 2016 WI 66, ¶143, 371 Wis. 2d 1, 885 N.W.2d 89 (Abrahamson & Ann Walsh Bradley, JJ., concurring in part and dissenting in part) (citing Hoffer Props., LLC v. DOT, 2016 WI 5, 366 Wis. 2d 372, 874 N.W.2d 533)).

[2] Birchfield v. North Dakota, 136 S. Ct. 2160, 2173 (2016); Skinner v. Ry. Labor Execs.' Ass'n, 489 U.S. 602, 616-17 (1989); Schmerber v. California, 384 U.S. 757, 767-68 (1966).

¶88 The lead opinion presents two questions of law that this court decides independently of the circuit court and court of appeals but benefiting from the analyses of those courts.

¶89 First, does a driver's "implied consent" under the Wisconsin Implied Consent Law constitute, by itself, voluntary and free consent to a warrantless blood draw for purposes of the Fourth Amendment? See Wis. Stat. § 343.305 (2015-16) (attached).[3]

¶90 Second, is the circuit court's finding of consent in fact supported by the record, and, if so, has the State met its burden of proving by clear and convincing evidence that the defendant, Navdeep S. Brar, voluntarily and freely consented to the warrantless blood draw?

¶91 I conclude that the lead opinion errs in deciding both issues.

¶92 In responding to the first question, which it need not address, the lead opinion proffers a muddled interpretation of the Implied Consent Law that violates the federal and state constitutional protections against unreasonable searches. The State asserts that the Fourth Amendment is irrelevant to a blood draw undertaken to determine whether the driver is intoxicated.

¶93 The lead opinion and the State engage in an unsound analysis of the text of the Wisconsin Implied Consent Law and relevant case law, including State v. Padley, 2014 WI App 65,

---

[3] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated. The 2015-16 version of § 343.305 is the same as the 2013-14 version.

354 Wis. 2d 545, 849 N.W.2d 867, <u>Missouri v. McNeely</u>, 133 S. Ct. 1552 (2013), and <u>Birchfield v. North Dakota</u>, 136 S. Ct. 2160 (2016).

¶94 In contrast to the lead opinion's and the State's positions, I conclude that neither a driver's obtaining a Wisconsin operators license nor a driver's operating a motor vehicle in Wisconsin is a manifestation of actual consent to a later search of the driver's person by a blood draw. In order for a law enforcement officer to draw blood from a driver without a warrant, a valid exception to the Fourth Amendment must apply at the time of the blood draw, such as the driver's free and voluntary consent or the existence of exigent circumstances. My position is consistent with recent decisions

of other state courts involving implied consent laws and conscious drivers.[4]

¶95 The instant case and the Wisconsin Implied Consent Law should be compared with a very recent (April 2017) Colorado case, People v. Hyde, 393 P.3d 962 (Colo. 2017). Hyde holds

---

[4] See, e.g., State v. Butler, 302 P.3d 609, 613 (Ariz. 2013) (holding that "independent of" the implied consent law, "the Fourth Amendment requires an arrestee's consent to be voluntary to justify a warrantless blood draw."); People v. Mason, 214 Cal. Rptr. 3d 685, 702 (Cal. Super. Ct. 2016) ("To recap, we have concluded that advance 'deemed' consent under the implied consent law cannot be considered actual Fourth Amendment consent."); Flonnory v. State, 109 A.3d 1060, 1065 (Del. 2015) ("Here, the trial court erred when it concluded that 'Defendant's statutory implied consent exempted the blood draw from the warrant requirement . . . .'"); Williams v. State, 771 S.E.2d 373, 377 (Ga. 2015) (collecting cases) ("cases seem to indicate . . . that mere compliance with statutory implied consent requirements does not, per se, equate to actual, and therefore voluntary, consent on the part of the suspect so as to be an exception to the constitutional mandate of a warrant"); State v. Halseth, 339 P.3d 368, 371 (Idaho 2014) ("[W]e hold that an implied consent statute . . . does not justify a warrantless blood draw from a driver who refuses to consent . . . or objects to the blood draw . . . . Consent to a search must be voluntary."); State v. Wulff, 337 P.3d 575, 581 (Idaho 2014) (same); Byars v. State, 336 P.3d 939, 946 (Nev. 2014) ("The implied consent provision . . . does not allow a driver to withdraw consent, thus a driver's so-called consent cannot be considered voluntary. Accordingly, we conclude that [the implied consent provision] is unconstitutional."); State v. Fierro, 853 N.W.2d 235, 243 (S.D. 2014) (ruling that a Fourth Amendment totality of the circumstances analysis must be performed to determine whether consent to a blood draw taken pursuant to state implied consent law was voluntary); Aviles v. State, 443 S.W.3d 291, 294 (Tex. Ct. App. 2014) (holding that implied consent and blood draw statutes are not permissible exceptions to the warrant requirement and stating that to hold otherwise "flies in the face of McNeely's repeated mandate that courts must consider the totality of the circumstances of each case").

that the driver's "statutory consent [under the Colorado statute] satisfied the consent exception to the Fourth Amendment warrant requirement." Hyde, 393 ¶.3d at 968.

¶96 Hyde is based on facts very different from the facts in the instant case. The Colorado Expressed Consent Statute governing Hyde is very different from the Wisconsin Implied Consent Law with regard to the facts of the Hyde case.

¶97 The different fact is that the driver in Hyde was unconscious when the blood was drawn.

¶98 The difference between the Colorado and Wisconsin laws is that with regard to an unconscious driver, the Colorado law provides: "An unconscious driver, on the other hand, 'shall be tested to determine the alcohol or drug content of the person's blood.' [Colo. Rev. Stat.] § 42-4-1301.1(8) [2016]. In other words, under the Expressed Consent Statute, the police need not wait until a drunk-driving suspect returns to consciousness, in order to afford that suspect an opportunity to refuse."[5]

¶99 In contrast, under Wisconsin's Implied Consent Law, unconscious drivers are "presumed not to have withdrawn consent," but Wisconsin law enforcement officers are not directed to conduct a blood draw on an unconscious driver. The

---

[5] People v. Hyde, 393 P.3d 962, 966 (Colo. 2017).

With regard to a conscious driver the Colorado Expressed Consent Statute is, according to the Colorado Supreme Court, similar in language and effect to implied consent laws in other states with regard to conscious drivers, even though the statute is phrased in terms of expressed consent. Hyde, 393 P.3d at 966 n.1.

Wisconsin Implied Consent Law (in contrast with the Colorado law) states that a blood draw "may be administered to the [unconscious] person." See Wis. Stat. § 343.305(3)(b) ("[a] person who is unconscious or otherwise not capable of withdrawing consent is presumed not to have withdrawn consent . . . ."). Compare State v. Howes, 2017 WI 18, 373 Wis. 2d 468, 893 N.W.2d 812 (lead opinion) (upholding a warrantless blood draw of an unconscious driver based on exigent circumstances rather than the Implied Consent Law).

¶100 In addition to these factual and statutory differences, Hyde is unavailing because Hyde's reasoning relies on unpersuasive readings of Missouri v. McNeely, 133 S. Ct. 1552 (2013), and Birchfield v. North Dakota, 136 S. Ct. 2160 (2016).

¶101 Indeed, Hyde has already been rejected by one state supreme court. In North Carolina v. Romano, No. 199PA16, 2017 WL 2492782 (N.C. June 9, 2017), the North Carolina Supreme Court was faced with the question whether drawing blood from an unconscious driver on the basis of only the implied consent law, without a warrant or exigent circumstances, and violated the Fourth Amendment.

¶102 The Romano court analyzed Hyde, McNeely and Birchfield. It disagreed with the Hyde court. It declared the blood draw unconstitutional: "Treating [the unconscious driver provision of the implied consent law] as an irrevocable rule of implied consent does not comport with the consent exception to the warrant requirement because such treatment does not require an analysis of the voluntariness of consent based on the

6

totality of the circumstances."[6] The Romano court interprets McNeely and Birchfield substantially the same as I do and as do other state courts.

¶103 In responding to the second question, I conclude the lead opinion again errs. The circuit court's finding of consent in fact is not supported by the record, and even if it is, the State has failed to meet its burden of proving by clear and convincing evidence that the defendant voluntarily and freely consented to the warrantless blood draw in the instant case.

¶104 Because the lead opinion errs as a matter of law and whittles away constitutional protections for the defendant and all of us, I dissent.

I

¶105 The lead opinion interprets the Wisconsin Implied Consent Law to mean that driving in Wisconsin amounts to voluntary and free consent to a blood draw. According to the lead opinion, the statutory "implied consent" given previously equates to actual consent at the time of the blood draw. In the lead opinion's view, the Implied Consent Law, standing alone, provides "consent sufficient under the Fourth Amendment——not some amorphous, lesser form of consent." Lead op., ¶21.

---

[6] North Carolina v. Romano, No. 199PA16, 2017 WL 2492782, at *8 (N.C. June 9, 2017).

The Romano court cites cases from two other states agreeing with its conclusion that the statutory implied consent does not satisfy the consent exception to the Fourth Amendment with regard to an unconscious driver. See State v. Havatone, 389 P.3d 1251, 1253, 1255 (Ariz. 2017); Bailey v. State, 790 S.E.2d 98, 103 & n.42 (Ga. App. 2016).

7

¶106 The lead opinion concludes: "Brar consented [to the blood draw] under Wisconsin's implied consent law. He availed himself of the roads of Wisconsin, and as a result, he consented through his conduct to a blood draw." Lead op., ¶29.

¶107 The lead opinion recognizes, however, that conscious drivers are statutorily given an opportunity to withdraw consent, lead op., ¶23 n.11, but does not address whether an opportunity to withdraw consent must always be given before a blood draw is taken. Lead op., ¶23 n.10.[7] Oddly, and inconsistently with the rest of its analysis, the lead opinion also recognizes that "[e]ven in implied consent cases, we consider the totality of the circumstances <u>at the time of the blood draw</u> to determine if an individual's previously-given consent <u>continues to be voluntary at that time</u>." Lead op., ¶25 (emphasis added).

¶108 The State takes a position similar to the lead opinion's. The State asserts that the Fourth Amendment is

---

[7] The law is clear, in my opinion, that inherent in the requirement of voluntary consent is the right of a person to withdraw consent. <u>See, e.g.</u>, <u>United States v. Dyer</u>, 784 F.2d 812, 816 (7th Cir. 1986) ("a person may limit or withdraw his [or her] consent to a search, and the police must honor such limitations."); <u>Burton v. United States</u>, 657 A.2d 741, 746 (D.C. 1994) (citing <u>Florida v. Jimeno</u>, 500 U.S. 248, 252 (1991) and <u>Dyer</u> to conclude: "We think these authorities compel the conclusion that when the basis for a warrantless search is consent, consent may be withdrawn any time prior to completion of the search, and we so hold."); 4 Wayne R. LaFave et al., <u>Search & Seizure: A Treatise on the Fourth Amendment</u> § 8.1(c) at 58 (5th ed. 2012) ("consent usually may be withdrawn or limited at any time prior to the completion of the search") (footnotes omitted).

irrelevant to a blood test requested under the Implied Consent Law. The State argues that when a driver is stopped and is read the Informing the Accused Form, which the legislature requires a law enforcement officer to read verbatim to a driver, the State is not soliciting Fourth Amendment consent to a blood draw.[8] The State's position is that the question at the Form stage is not whether the driver consents to the test, "but rather whether the subject will submit to the test he previously agreed to take, or recant his consent and face the adverse consequences of a refusal."[9]

¶109 According to the State, when a driver is stopped and a law enforcement officer employs the Implied Consent Law to take a warrantless blood draw, the Fourth Amendment is not involved:

> This is not Fourth Amendment consent terrain; it is the statutory world of implied consent, a world the subject has entered though his own behavior. The injection of Fourth Amendment consent principles into the Form phase of the implied consent statute contradicts Wisconsin and U.S. Supreme Court cases dealing with the law and would severely undermine the statute's critical role in combating the national problem of drunken driving.[10]

---

[8] The State notes that, under its interpretation of the Implied Consent Law, whether consent to the blood draw is deemed to occur when a driver applies for an operating license or when a driver operates a vehicle is not material. In either case, says the State, the driver has given consent to the blood draw under the Implied Consent Law before the driver is pulled over on suspicion of drunk driving.

[9] Brief of Plaintiff-Respondent (State) at 7.

[10] Brief of Plaintiff-Respondent (State) at 8-9.

¶110 The State contends that Fourth Amendment constitutional rights come into play at the Informing the Accused stage only <u>after</u> the driver refuses to allow a blood draw and the State seeks a warrant for the blood draw or asserts that a Fourth Amendment exception applies, such as exigent circumstances.

¶111 I disagree with the interpretations of the Informed Consent Law proffered by the lead opinion and the State.

¶112 The lead opinion's and the State's interpretation of the Implied Consent law contravenes the text of the Law. By its plain terms, the Law does not treat the driver as having actually consented to a blood draw. By its plain terms, the Law does not empower law enforcement officers to draw a blood sample when the vehicle is stopped. Rather, the Law directs a law enforcement officer to inform the driver that a request is being made for a test, that the driver may refuse to take the test, and that the driver will face civil legal consequences upon refusal to take the test.

¶113 The text of the Informing the Accused Form, which the Law requires to be read to the driver verbatim, advises the driver that he or she may refuse to give a blood sample but that a refusal has consequences, including revocation of operating privileges and use of evidence of the refusal against the driver in court. Wis. Stat. § 343.305(4). If the Implied Consent Law furnishes actual consent to a blood draw, why would the legislature require officers to inform drivers when they are

10

stopped that the officer is requesting a test and that the driver may refuse the requested test?

¶114 I conclude that in the context of the Wisconsin Implied Consent Law, the conduct that equates to consent valid under the United States and Wisconsin constitutions is the driver's agreeing to submit to the test after being read the Informing the Accused Form. Were it otherwise, there would be no need to read the Form or request a test.

¶115 I conclude that the court of appeals interpreted the Implied Consent Law correctly in State v. Padley, 2014 WI App 65, 354 Wis. 2d 545, 849 N.W.2d 867: The "implied consent" given by drivers on Wisconsin highways pursuant to the Implied Consent Law does not equate to "actual consent" under the Fourth Amendment. Padley, 354 Wis. 2d 545, ¶¶38-39.

¶116 The Padley court concluded that a driver's actual consent occurs after the driver has heard the Informing the Accused Form, weighed his or her options (including the refusal penalties), and decided whether to give or decline actual consent. Padley, 354 Wis. 2d 545, ¶39. The Implied Consent Law gives a driver a choice whether to give or decline to give actual consent when confronted with a request by a law enforcement officer for a blood draw:

> [T]he implied consent law is explicitly designed to allow the driver, and not the police officer, to make the choice as to whether the driver will give or decline to give actual consent to a blood draw when put to the choice between consent or automatic sanctions. Framed in the terms of "implied consent," choosing the "yes" option affirms the driver's implied consent and constitutes actual consent for the blood draw. Choosing the "no" option acts to withdraw the

11

driver's implied consent and establishes that the driver does not give actual consent. Withdrawing consent by choosing the "no" option is an unlawful action, in that it is penalized by "refusal violation" sanctions, even though it is a choice the driver can make.

Padley, 354 Wis. 2d 545, ¶39.

¶117 Both the lead opinion and the State suggest that Padley is incorrect as a matter of law, but neither advocates expressly overruling the case.[11] Padley is binding precedent. Wis. Stat. § 752.41. The lead opinion should abide by Padley, overturn it, or distinguish it. Instead, the lead opinion

---

[11] The defendant asserts that the State has forfeited the issues whether the Fourth Amendment applies to the "Form" stage of implied consent cases and whether Padley was wrongly decided. The defendant argues that at no point in this litigation did the State assert this position until its brief in this court. See Reply Brief of Defendant-Appellant-Petitioner at 4; Wis. Stat. § (Rule) 809.62; State v. Denny, 2017 WI 17, ¶117, 373 Wis. 2d 390, 891 N.W.2d 144 (Abrahamson, J., dissenting); Michael Heffernan, Appellate Practice and Procedure in Wisconsin § 23.8 (7th ed. 2016) ("Failure to raise an issue in the petition for review is deemed a waiver of any claim that the supreme court should consider the issue.").

In the court of appeals, the State took the position that Padley was correctly decided by relying on it. See Plaintiff-Respondent's (State of Wisconsin) Court of Appeals Brief at 3 ("'Consent' is not to be confused with Wisconsin's 'implied consent' statute, a law which gives law enforcement the authority to require drivers to choose between consenting to a blood draw or refusing and facing penalties enacted by the legislature.") (citing Padley, 354 Wis. 2d 545, ¶¶27, 33).

In this court, the State asserts that Padley's view of the Implied Consent Law is not correct and that when the Implied Consent Law is in play, it "is not Fourth Amendment consent terrain; it is the statutory world of implied consent, a world the subject has entered through his own behavior." Brief of Plaintiff-Respondent (State of Wisconsin) at 8.

swipes at <u>Padley</u> with clawless paws, unnecessarily leaving <u>Padley</u> and the Implied Consent Law in a state of uncertainty.

¶118 In addition to not adhering to the text of the Wisconsin Implied Consent Law or <u>Padley</u>, the lead opinion does not, in my opinion, pay acute attention to the United States Supreme Court's recent drunk-driving cases.[12]

---

[12] The lead opinion's reliance on pre-<u>McNeely</u> and pre-<u>Birchfield</u> Wisconsin drunk-driving cases (such as <u>State v. Neitzel</u>, 95 Wis. 2d 191, 289 N.W.2d 828 (1980), and <u>State v. Piddington</u>, 2001 WI 24, 241 Wis. 2d 754, 623 N.W.2d 528), is dubious for several reasons.

Recent United States Supreme Court cases significantly changed the constitutional landscape of drunk-driving. <u>See</u> <u>State v. Tullberg</u>, 2014 WI 134, ¶42, 359 Wis. 2d 421, 857 N.W.2d 120, <u>cert. denied</u>, 135 S. Ct. 2327 (2015) (<u>McNeely</u> "changed the landscape of warrantless blood draws in Wisconsin . . . .").

The statutes at issue in those cases are not the same as the statute involved in this instant case, and the lead opinion fails to explain why these cases should control its analysis.

The language from these cases upon which the lead opinion relies is taken out of context.

The issue addressed in <u>Neitzel</u> was whether the accused had a right to confer with counsel before deciding to take or refuse to take a chemical test for intoxication.  The court held that Neitzel did not have the right to confer with counsel.  The issue in the case did not involve implied consent as such.

(continued)

13

¶119 The United States Supreme Court has not questioned the constitutionality of implied consent laws imposing civil consequences. Indeed it has confirmed their constitutionality.[13] The United States Supreme Court has not, however, directly decided that the consent exception to the Fourth Amendment is satisfied solely by implied consent under a state implied consent law. The Court also has not explicitly decided that state implied consent laws do <u>not</u> provide actual consent satisfying the Fourth Amendment. In my opinion, this latter proposition is implicit in the Court's recent drunk-driving cases. As Professor LaFave has observed: "Consent in any meaningful sense cannot be said to exist merely because a person

---

In <u>Piddington</u>, the issue was whether the accused, who was profoundly deaf since birth, fully understood the information he was given orally by the law enforcement officer pursuant to the Implied Consent Law. The circuit court ruled that the State had not met its burden to show that the accused understood the information he was given. The supreme court ruled that whether the accused actually comprehended the warnings is not a required part of the inquiry. According to the supreme court, the test is whether the law enforcement officer's attempts to communicate with the accused were reasonable under all of the circumstances. The court did not address whether the accused voluntarily and freely consented to a blood draw.

[13] <u>See</u> <u>Missouri v. McNeely</u>, 133 S. Ct. 1552, 1566 (2013) ("States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense."); <u>Birchfield v. North Dakota</u>, 136 S. Ct. 2160, 2185 (2016) ("Our prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply . . . and nothing we say here should be read to cast doubt on them.").

14

(a) knows that an official intrusion into his privacy is contemplated if he does a certain thing, and then (b) proceeds to do that thing."[14]

¶120 In Missouri v. McNeely, 133 S. Ct. 1552 (2013) and Birchfield v. North Dakota, 136 S. Ct. 2160 (2016), the Court did not expressly address the issue of implied consent stemming from implied consent laws. But the Court's reasoning derived from Schmerber v. California, 377 U.S. 757 (1966), is directly applicable to the issue of consent.

¶121 In McNeely, 133 S. Ct. at 1566, the driver refused to consent to a blood draw. The Court recognized that valid Fourth Amendment consent had to be obtained before blood was validly drawn under the Fourth Amendment, unless an exception other than consent was in play.

¶122 The McNeely court (in a plurality opinion) explained: "Whether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances." McNeely, 133 S. Ct. at 1563.[15] This emphasis on totality of circumstances suggests a broader reading of McNeely than limiting McNeely to exigent circumstances.

---

[14] 4 Wayne R. LaFave et al., Search & Seizure: A Treatise on the Fourth Amendment, § 8.2(l) at 164-65 (5th ed. 2012).

[15] The Supreme Court of Georgia has explained: "To hold that the legislature could nonetheless pass laws stating that a person 'impliedly' consents to searches under certain circumstances where a search would otherwise be unlawful would be to condone an unconstitutional bypassing of the Fourth Amendment." Cooper v. State, 587 S.E.2d 605, 612 (Ga. 2003) (quoting Hannoy v. State, 789 N.E.2d 977, 987 (Ind. App. 2003)).

15

¶123 Shortly after the McNeely decision, the United States Supreme Court vacated a Texas judgment upholding a forced blood draw based solely on consent derived from the Texas implied consent statute and remanded the matter to the state court for further consideration in light of McNeely. Aviles v. Texas, 134 S. Ct. 902, 902 (2014), vacating 385 S.W.3d 110 (Tex. Ct. App. 2012). Aviles suggests that McNeely should be read broadly to apply to all warrantless blood draws and that the Texas implied consent statute was not a per se exception to the Fourth Amendment justifying warrantless blood draws. The Texas court so interpreted the United States Supreme Court decision on remand.[16]

¶124 Birchfield echoes McNeely and Aviles. The Birchfield Court noted that "[o]ur prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply." Birchfield, 136 S. Ct. at 2185. The Court characterized implied consent laws as laws "to induce motorists to submit to BAC testing." 136 S. Ct. at 2180. The Birchfield Court explained that implied consent laws "provide[] that cooperation with BAC testing [is] a condition of the privilege of driving on state roads and that the privilege [will] be

---

[16] Aviles v. State, 443 S.W.3d 291, 294 (Tex. Ct. App. 2014) (holding that implied consent and blood draw statutes are not permissible exceptions to the warrant requirement and stating that to hold otherwise "flies in the face of McNeely's repeated mandate that courts must consider the totality of the circumstances of each case").

16

rescinded if a suspected drunk driver refuse[s] to honor that condition." Birchfield, 136 S. Ct. at 2169.

¶125 One of the petitioners in Birchfield, Michael Beylund, complied with a law enforcement officer's demand for a blood sample under North Dakota's implied consent law, which imposed criminal penalties on a driver for refusal to submit to a blood test.[17] Birchfield, 136 S. Ct. at 2172. Although Beylund submitted to the blood draw, the Birchfield court did not rely on "implied consent" derived from the implied consent law or acquiescence to uphold the constitutionality of the blood draw. Rather, the Court remanded the case to the North Dakota state court to determine whether Beylund's submission to the blood draw under the totality of the circumstances was voluntary consent to the search under the Fourth Amendment when he was erroneously told that the law required his submission to the blood draw and that the State could compel a blood test. Birchfield, 136 S. Ct. at 2186.

¶126 Considering the text of the Wisconsin Implied Consent Law, Padley, the United States Supreme Court language in McNeely and Birchfield, the remand of Aviles, and the required totality of circumstances analysis to determine voluntary consent (which I discuss further below), I conclude that neither a Wisconsin

---

[17] The Birchfield Court noted that "[t]here must be some limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads," and "conclude[d] that motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." Birchfield, 136 S. Ct. at 2185-86.

17

driver's license nor the operation of a motor vehicle in Wisconsin is a manifestation of actual consent to a later search of the driver's person by means of a blood draw. To draw blood without a warrant or an exception to the Fourth Amendment, the driver's valid consent under the Fourth Amendment must be obtained at the time of the blood draw.

II

¶127 Whether the defendant consented in fact to the blood draw and whether the consent was voluntarily and freely given under the Fourth Amendment and the Wisconsin constitution are questions of law that this court decides independently.

¶128 I disagree with the lead opinion's analyses and conclusions of law.

¶129 Consent in fact is a question of historical fact. This court will uphold a circuit court's finding of fact "if it is not contrary to the great weight and clear preponderance of the evidence." State v. Artic, 2010 WI 83, ¶30, 327 Wis. 2d 392, 786 N.W.2d 430.[18] This court, however, independently applies constitutional principles to these facts.[19]

---

[18] State v. Robinson, 2010 WI 80, ¶22, 327 Wis. 2d 302, 786 N.W.2d 463 ("When presented with a question of constitutional fact, this court engages in a two-step inquiry. First, we review the circuit court's findings of historical fact under a deferential standard, upholding them unless they are clearly erroneous. Second, we independently apply constitutional principles to those facts.") (internal citations omitted).

[19] State v. Post, 2007 WI 60, ¶8, 301 Wis. 2d 1, 733 N.W.2d 634 (citing State v. Martwick, 2000 WI 5, ¶16, 231 Wis. 2d 801, 604 N.W.2d 552).

¶130 In the instant case, the record includes an audiovisual recording of the exchange during which the defendant's alleged consent took place. Just as when a case and its factual issues are contained solely in written, documentary evidence, I can independently analyze the audiovisual evidence and need not give special deference to the circuit court's findings regarding factual issues, such as consent in fact.[20]

---

[20] In such circumstances, the trial court's factual findings do not carry the same weight because the "trial court's customary opportunity to evaluate the demeanor and thus the credibility of the witnesses . . . plays only a restricted role . . . ." Pullman-Standard v. Swint, 456 U.S. 273, 301-02 (1982) (Marshall, J., dissenting) (quoting United States v. Gen. Motors Corp., 384 U.S. 127, 141 (1966) and citing Jennings v. Gen. Med. Corp., 604 F.2d 1300, 1305 (10th Cir. 1979)); Hague v. Liberty Mut. Ins. Co., 571 F.2d 262, 264 (5th Cir. 1978) ("Because the case was submitted to the district court in the form of documents and transcripts, [the] burden of showing that the district court's findings of fact were 'clearly erroneous' is somewhat lessened.").

(continued)

¶131 The audiovisual recording undermines the circuit court's finding of consent in fact and the lead opinion's discussion. The defendant did utter the words "of course," but they are associated with his comment that "I don't want my license to be taken. This is a complicated question."

¶132 Although the lead opinion finds that "[n]othing in the recording rebuts the officer's testimony as to Brar's statements," lead op., ¶33, the audiovisual recording does conflict with the officer's testimony describing the "of course" comment. The lead opinion's affirmation of consent in fact based on the recording is rebutted by the audiovisual recording. The recording does not support the finding that the defendant consented in fact.

---

Accord Lambrecht v. Estate of Kaczmarczyk, 2001 WI 25, ¶27, 241 Wis. 2d 804, 623 N.W.2d 751 ("This court and the circuit court are equally able to read the written record."); State ex rel. Sieloff v. Golz, 80 Wis. 2d 225, 241, 258 N.W.2d 700 (1977) (same); Vogt, Inc. v. Int'l Bhd. of Teamsters, 270 Wis. 315, 71 N.W.2d 359 (1955), on reargument, 270 Wis. 321b, 321i, 74 N.W.2d 749 (1956) ("[The reason for the clearly erroneous standard is that the] appellate court must give weight to the findings of a trial court made in a contested matter upon oral testimony where the trial judge is in a position to pass on the credibility of the witnesses and the weight to be given to their testimony. He has full opportunity to observe the demeanor of the witnesses and judge their veracity—the appellate court does not. The reason for the rule disappears, however, when the appeal is presented upon no more than pleadings and affidavits, as is the case here."); Cohn v. Town of Randall, 2001 WI App 176, ¶7, 247 Wis. 2d 118, 633 N.W.2d 674 ("We are in just as good a position as the trial court to make factual inferences based on documentary evidence and we need not defer to the trial court's findings."); Racine Educ. Ass'n v. Bd. of Educ., 145 Wis. 2d 518, 521, 427 N.W.2d 414 (Ct. App. 1988) (same); Pfeifer v. World Serv. Life Ins. Co., 121 Wis. 2d 567, 571 n.1, 360 N.W.2d 65 (Ct. App. 1984) (same).

20

¶133 Rather, the audiovisual recording suggests, in my opinion, that the defendant was "stalling" to avoid taking the test. The law enforcement officer should have treated the defendant's conduct as a refusal to allow the blood test.[21]

¶134 In sum, based upon the audiovisual recording, I conclude that the defendant did not consent in fact to the blood draw.

¶135 Even if the defendant consented in fact, the question becomes whether the consent was freely and voluntarily given, that is, whether the consent was constitutionally valid.

¶136 The lead opinion delves into what constitutes voluntary consent, attempting to redefine the Fourth Amendment consent standard. The lead opinion withdraws "any language . . . [in the cases] that requires that consent to a search be given knowingly and intelligently." Lead op., ¶27. Thus, the lead opinion overrules a number of unnamed cases, including Gautreaux v. State, 52 Wis. 2d 489, 492, 190 N.W.2d 542 (1971), a longstanding precedent.

¶137 More than forty years ago in Gautreaux, the Wisconsin Supreme Court stated the following regarding a defendant's consent to a constitutionally protected search: "[T]he state

---

[21] See State v. Rydeski, 214 Wis. 2d 101, 107, 571 N.W.2d 417 (Ct. App. 1997) (driver's conduct in insisting on using the restroom after agreeing to take the test in order to stall qualified as a "refusal"); Village of Elkhart Lake v. Borzyskowski, 123 Wis. 2d 185, 191, 366 N.W.2d 506 (Ct. App. 1985) (driver who, while not verbally refusing to take breathalyzer test, engaged in conduct which effectively prevented officer from obtaining accurate breath sample refused to take the test).

21

has the burden of proving by clear and positive evidence the search was the result of a free, intelligent, unequivocal and specific consent . . . ." Gautreaux v. State, 52 Wis. 2d 489, 492, 190 N.W.2d 542 (1971) (emphasis added).[22] Gautreaux has not been overruled.

¶138 Why does the lead opinion attempt to overrule Gautreaux now? Because, according to the lead opinion, "we interpret our constitution consistent with the Fourth Amendment," and the United States Supreme Court has said that "[n]othing, either in the purposes behind requiring a 'knowing' and 'intelligent' waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures." Lead op., ¶¶19 n.8, 27 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 241 (1973)).

¶139 This reasoning is unsound. First, this court need not (and does not always) interpret Article I, Section 11 of the Wisconsin Constitution in tandem with the Fourth Amendment to the United States Constitution. See, e.g., State v. Dubose, 2005 WI 126, ¶41, 285 Wis. 2d 143, 699 N.W.2d 582; State v. Eason, 2001 WI 98, ¶60, 245 Wis. 2d 206, 629 N.W.2d 625.

¶140 Second, it seems to me that the substance of the "knowing" and "intelligent" standard, even if not precisely the same as used in the waiver of constitutional trial rights

---

[22] Citing Holt v. State, 17 Wis. 2d 468, 117 N.W.2d 626 (1962); United States v. Callahan, 439 F.2d 852 (2d Cir. 1971); United States v. Berkowitz, 429 F.2d 921 (1st Cir. 1970).

22

discussed in <u>Schneckloth</u>, 412 U.S. at 141,[23] is implicitly required by the totality of the circumstances test that the United States Supreme Court and this court have adopted to determine the voluntariness of consent under the federal and state constitutions.

¶141 The United States Supreme Court in <u>Schneckloth</u>, upon which the lead opinion relies, recognized that "knowing" and "intelligent" play a role in determining whether valid consent was given under the Fourth Amendment. The <u>Schneckloth</u> Court stated:

> The traditional definition of voluntariness we accept today [for Fourth Amendment purposes] has always taken into account evidence of minimal schooling, low intelligence, and the lack of any effective warnings to a person of his rights; and the voluntariness of any statement taken under those conditions has been carefully scrutinized to determine whether it was in fact voluntarily given.

<u>Schneckloth</u>, 412 U.S. at 248.

¶142 The factors listed in the Wisconsin cases to be considered in determining voluntary consent under the Fourth Amendment and the Wisconsin Constitution are similar and also

---

[23] In <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 241 (1973), the United States Supreme Court declared:

> There is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment. Nothing, either in the purposes of behind requiring a "knowing" and "intelligent" waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures.

23

imply that a defendant's consent must be knowing and intelligent. See State v. Artic, 2010 WI 83, ¶¶28-33, 327 Wis. 2d 392, 786 N.W.2d 430.

¶143 The Artic case sets forth the following non-exclusive list of factors to be considered in the totality of the circumstances to determine whether consent was freely and voluntarily given:

> (1) whether the police used deception, trickery, or misrepresentation in their dialogue with the defendant to persuade him to consent; (2) whether the police threatened or physically intimidated the defendant or "punished" him by the deprivation of something like food or sleep; (3) whether the conditions attending the request to search were congenial, non-threatening, and cooperative, or the opposite; (4) how the defendant responded to the request to search; (5) what characteristics the defendant had as to age, intelligence, education, physical and emotional condition, and prior experience with the police; and (6) whether the police informed the defendant that he could refuse consent.

State v. Artic, 2010 WI 83, ¶33, 327 Wis. 2d 392, 786 N.W.2d 430 (citing State v. Phillips, 218 Wis. 2d 180, 198-203, 577 N.W.2d 794 (1998) (emphasis added).

¶144 Indeed, the statement in Padley 354 Wis. 2d 545, ¶64, that consent requires a showing that a "search was the result of a free, intelligent, unequivocal and specific consent without any duress or coercion, actual or implied" seems to be a

24

shorthand form for the factors that this court has set forth in Artic.[24]

¶145 With regard to the defendant's consent in the instant case, it was obtained by the officer's giving the defendant misinformation, namely that the officer did not need a warrant to draw blood.[25] Advising the defendant, through words or conduct, that a warrant was not required for a blood draw was either an express or implied "unlawful assertion of police authority" to take a blood draw without a warrant.[26] Moreover, the first factor identified in Artic, "whether the police used deception, trickery, or misrepresentation in their dialogue with

---

[24] State v. Padley, 354 Wis. 2d 545, ¶64 (quoting State v. Johnson, 177 Wis. 2d 224, 233, 501 N.W.2d 876 (Wis. Ct. App. 1993) (quoting Gautreaux, 52 Wis. 2d at 492)); accord State v. Giebel, 2006 WI App 239, ¶18, 297 Wis. 2d 446, 724 N.W.2d 402 ("Orderly submission to law enforcement officers who, in effect, incorrectly represent that they have the authority to search and seize property, is not knowing, intelligent and voluntary consent under the Fourth Amendment.") (Emphasis added.).

[25] See State v. Giebel, 2006 WI App 239, ¶18, 297 Wis. 2d 446, 724 N.W.2d 402 (citing United States v. Elliot, 210 F. Supp. 357, 360 (D. Mass. 1962) ("Orderly submission to law enforcement officers who, in effect, incorrectly represent that they have authority to search and seize property is not knowing, intelligent and voluntary consent under the Fourth Amendment.").

[26] State v. Johnson, 2007 WI 32, ¶16, 299 Wis. 2d 675, 729 N.W.2d 182 (citing Johnson v. United States, 333 U.S. 10, 12-13 (1948); United States v. Morales, 171 F.3d 978, 982-83 (5th Cir. 1999); United States v. Pena-Saiz, 161 F.3d 1175, 1177 (8th Cir. 1998); United States v. Baro, 15 F.3d 563, 566-67 (6th Cir. 1994); State v. Wuest, 190 Wis. 251, 255, 208 N.W. 899 (1926); State v. Johnson, 177 Wis. 2d 224, 228, 234, 501 N.W.2d 876 (Ct. App. 1993)).

the defendant to persuade him to consent," is pertinent in the instant case.[27]

¶146 I conclude that the defendant did not consent in fact and that if he did, the consent was not the result of "an essentially free and unconstrained choice," Schneckloth, 412 U.S. at 225, 227, but merely his acquiescence to an unlawful assertion of police authority. The officer erroneously advised the defendant that blood could be drawn without a warrant. See lead op., ¶6. Accordingly, I conclude that the results of the warrantless blood draw should be suppressed.

¶147 For the reasons set forth, I dissent.

¶148 I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

---

[27] State v. Artic, 2010 WI 83, ¶33, 327 Wis. 2d 392, 786 N.W.2d 430. See also Bumper v. North Carolina, 391 U.S. 543, 548 (1968); State v. Rodgers, 119 Wis. 2d 102, 349 N.W.2d 453 (1984) ("Acquiescence to an unlawful assertion of police authority is not equivalent to consent.").

See also Birchfield, 136 S. Ct. at 2187 (remanding Beylund's case to the state courts to determine whether submission to a blood draw after the arresting officer erroneously advised the accused that he was subject to criminal penalties if he refused to allow the blood draw).

26

interlock device for the purpose of providing the person an operable motor vehicle without the necessity of first submitting a sample of his or her breath to analysis by the ignition interlock device, or otherwise tampers with or circumvents the operation of the ignition interlock device.

**(5)** If the court enters an order under sub. (1g), the court shall impose and the person shall pay to the clerk of court an ignition interlock surcharge of $50. The clerk of court shall transmit the amount to the county treasurer.

History: 1999 a. 109; 2001 a. 16 ss. 3417m to 3420t, 4060gj, 4060hw, 4060hy; 2001 a. 104; 2009 a. 100; 2013 a. 168; 2015 a. 389.

Sub. (1g) (b) 2. requires an order for ignition interlock devices when a person violates s. 346.63 (1) and has one or more prior OWI convictions. Sub. (1g) (b) 2. provides no restrictions on how to count prior convictions for purposes of ordering ignition interlock devices. The ten−year look−back provision in s. 346.65 (2) (am) 2. for purposes of determining whether to charge or penalize a repeat OWI offender civilly or criminally is independent of and has no effect on orders for ignition interlock devices under this section. Village of Grafton v. Seatz, 2014 WI App 23, 352 Wis. 2d 747, 845 N.W.2d 672, 13−1414.

Wisconsin's New OWI Law. Mishlove & Stuckert. Wis. Law. June 2010.

**343.303 Preliminary breath screening test.** If a law enforcement officer has probable cause to believe that the person is violating or has violated s. 346.63 (1) or (2m) or a local ordinance in conformity therewith, or s. 346.63 (2) or (6) or 940.25 or s. 940.09 where the offense involved the use of a vehicle, or if the officer detects any presence of alcohol, a controlled substance, controlled substance analog or other drug, or a combination thereof, on a person driving or operating or on duty time with respect to a commercial motor vehicle or has reason to believe that the person is violating or has violated s. 346.63 (7) or a local ordinance in conformity therewith, the officer, prior to an arrest, may request the person to provide a sample of his or her breath for a preliminary breath screening test using a device approved by the department for this purpose. The result of this preliminary breath screening test may be used by the law enforcement officer for the purpose of deciding whether or not the person shall be arrested for a violation of s. 346.63 (1), (2m), (5) or (7) or a local ordinance in conformity therewith, or s. 346.63 (2) or (6), 940.09 (1) or 940.25 and whether or not to require or request chemical tests as authorized under s. 343.305 (3). The result of the preliminary breath screening test shall not be admissible in any action or proceeding except to show probable cause for an arrest, if the arrest is challenged, or to prove that a chemical test was properly required or requested of a person under s. 343.305 (3). Following the screening test, additional tests may be required or requested of the driver under s. 343.305 (3). The general penalty provision under s. 939.61 (1) does not apply to a refusal to take a preliminary breath screening test.

History: 1981 c. 20; 1985 a. 32 s. 3; 1985 a. 337; 1987 a. 3; 1989 a. 105; 1991 a. 277; 1995 a. 448.

A prosecutor's statement that the defendant failed a preliminary breath test was improper, but evidence that the defendant refused to take a breathalyzer test was relevant and constitutionally admissible. State v. Albright, 98 Wis. 2d 663, 298 N.W.2d 196 (Ct. App. 1980).

A preliminary breath test result is not determinative of probable cause to arrest for driving while intoxicated. A low test result does not void the grounds for arrest. Dane County v. Sharpee, 154 Wis. 2d 515, 453 N.W.2d 508 (Ct. App. 1990).

The bar of preliminary breath tests under this section is limited to proceedings related to arrests for offenses contemplated under this statute including those related to motor vehicles and intoxication. State v. Beaver, 181 Wis. 2d 959, 512 N.W.2d 254 (Ct. App. 1994).

This section bars the evidentiary use of preliminary breath test results in motor vehicle violation cases, but not in other actions. Prosecutors who wish to rely on PBT results are required to present evidence of the device's scientific accuracy as a foundation for admission. State v. Doerr, 229 Wis. 2d 616, 599 N.W.2d 897 (Ct. App. 1999), 98−1047.

"Probable cause to believe" refers to a quantum of evidence greater than reasonable suspicion to make an investigative stop, but less than probable cause to make an arrest. County of Jefferson v. Renz, 231 Wis. 2d 293, 603 N.W.2d 541 (1999), 97−3512.

Blood may be drawn in a search incident to an arrest for a non−drunk−driving offense if the police reasonably suspect that the defendant's blood contains evidence of a crime. This section does not prohibit the consideration of a suspect's refusal to submit to a PBT for purposes of determining whether a warrantless involuntary draw of the suspect's blood was supported by reasonable suspicion. State v. Repenshek, 2004 WI App 229, 277 Wis. 2d 780, 691 N.W.2d 369, 03−3089

A preliminary breath test may be requested when an officer has a basis to justify an investigative stop but has not established probable cause to justify an arrest. Under the facts of this case, the officer would have been justified in asking the defendant to take a preliminary breath test without asking him to perform any field−sobriety tests. That the defendant successfully completed all properly administered field−sobriety

tests did not subtract from the common−sense view that the defendant may have had an impermissible blood−alcohol level. State v. Felton, 2012 WI App 114, 344 Wis. 2d 483, 824 N.W.2d 871, 11−2119.

Under State v. St. George, 2002 WI 50, for a defendant to establish a constitutional right to the admissibility of proffered expert testimony, the defendant must satisfy a two−part inquiry determining whether the evidence is clearly central to the defense and the exclusion of the evidence is arbitrary and disproportionate to the purpose of the rule of exclusion, so that exclusion undermines fundamental elements of the defendant's defense. In an OWI prosecution, even if a defendant establishes a constitutional right to present an expert opinion that is based in part on PBT results, the right to do so is outweighed by the state's compelling interest to exclude that evidence. State v. Fischer, 2010 WI 6, 322 Wis. 2d 265, 778 N.W.2d 629, 07−1898. But see Fischer v. Ozaukee County Circuit Court, 741 F. Supp. 2d 944 (2010).

Probable cause exists to request a preliminary breath test sample when the driver is known to be subject to a .02 prohibited alcohol content standard, the officer knows it would take very little alcohol for the driver to exceed that limit, and the officer smells alcohol on the driver. State v. Goss, 2011 WI 104, 338 Wis. 2d 72, 806 N.W.2d 918, 10−1113.

The Wisconsin Supreme Court's decision in Fischer affirming the exclusion of the defendant's expert's testimony using PBT results involved an unreasonable application of federal law as determined by the United States Supreme Court. Fischer v. Ozaukee County Circuit Court, 741 F. Supp. 2d 944 (2010).

**343.305 Tests for intoxication; administrative suspension and court−ordered revocation.** **(1)** DEFINITIONS. In this section:

(b) "Drive" means the exercise of physical control over the speed and direction of a motor vehicle while it is in motion.

(c) "Operate" means the physical manipulation or activation of any of the controls of a motor vehicle necessary to put it in motion.

**(2)** IMPLIED CONSENT. Any person who is on duty time with respect to a commercial motor vehicle or drives or operates a motor vehicle upon the public highways of this state, or in those areas enumerated in s. 346.61, is deemed to have given consent to one or more tests of his or her breath, blood or urine, for the purpose of determining the presence or quantity in his or her blood or breath, of alcohol, controlled substances, controlled substance analogs or other drugs, or any combination of alcohol, controlled substances, controlled substance analogs and other drugs, when requested to do so by a law enforcement officer under sub. (3) (a) or (am) or when required to do so under sub. (3) (ar) or (b). Any such tests shall be administered upon the request of a law enforcement officer. The law enforcement agency by which the officer is employed shall be prepared to administer, either at its agency or any other agency or facility, 2 of the 3 tests under sub. (3) (a), (am), or (ar), and may designate which of the tests shall be administered first.

**(3)** REQUESTED OR REQUIRED. (a) Upon arrest of a person for violation of s. 346.63 (1), (2m) or (5) or a local ordinance in conformity therewith, or for a violation of s. 346.63 (2) or (6) or 940.25, or s. 940.09 where the offense involved the use of a vehicle, or upon arrest subsequent to a refusal under par. (ar), a law enforcement officer may request the person to provide one or more samples of his or her breath, blood or urine for the purpose specified under sub. (2). Compliance with a request for one type of sample does not bar a subsequent request for a different type of sample.

(am) Prior to arrest, a law enforcement officer may request the person to provide one or more samples of his or her breath, blood or urine for the purpose specified under sub. (2) whenever a law enforcement officer detects any presence of alcohol, a controlled substance, a controlled substance analog or other drug, or a combination thereof, on a person driving or operating or on duty time with respect to a commercial motor vehicle or has reason to believe the person is violating or has violated s. 346.63 (7). Compliance with a request for one type of sample does not bar a subsequent request for a different type of sample. For the purposes of this paragraph, "law enforcement officer" includes inspectors in the performance of duties under s. 110.07 (3).

(ar) 1. If a person is the operator of a vehicle that is involved in an accident that causes substantial bodily harm, as defined in s. 939.22 (38), to any person, and a law enforcement officer detects any presence of alcohol, a controlled substance, a controlled substance analog or other drug, or a combination thereof, the law enforcement officer may request the operator to provide one or

more samples of his or her breath, blood, or urine for the purpose specified under sub. (2). Compliance with a request for one type of sample does not bar a subsequent request for a different type of sample. A person who is unconscious or otherwise not capable of withdrawing consent is presumed not to have withdrawn consent under this subdivision and one or more samples specified in par. (a) or (am) may be administered to the person. If a person refuses to take a test under this subdivision, he or she may be arrested under par. (a).

2. If a person is the operator of a vehicle that is involved in an accident that causes the death of or great bodily harm to any person and the law enforcement officer has reason to believe that the person violated any state or local traffic law, the officer may request the operator to provide one or more samples of his or her breath, blood, or urine for the purpose specified under sub. (2). Compliance with a request for one type of sample does not bar a subsequent request for a different type of sample. A person who is unconscious or otherwise not capable of withdrawing consent is presumed not to have withdrawn consent under this subdivision and one or more samples specified in par. (a) or (am) may be administered to the person. If a person refuses to take a test under this subdivision, he or she may be arrested under par. (a).

(b) A person who is unconscious or otherwise not capable of withdrawing consent is presumed not to have withdrawn consent under this subsection, and if a law enforcement officer has probable cause to believe that the person has violated s. 346.63 (1), (2m) or (5) or a local ordinance in conformity therewith, or s. 346.63 (2) or (6) or 940.25, or s. 940.09 where the offense involved the use of a vehicle, or detects any presence of alcohol, controlled substance, controlled substance analog or other drug, or a combination thereof, on a person driving or operating or on duty time with respect to a commercial motor vehicle or has reason to believe the person has violated s. 346.63 (7), one or more samples specified in par. (a) or (am) may be administered to the person.

(c) This section does not limit the right of a law enforcement officer to obtain evidence by any other lawful means.

(4) INFORMATION. At the time that a chemical test specimen is requested under sub. (3) (a), (am), or (ar), the law enforcement officer shall read the following to the person from whom the test specimen is requested:

"You have either been arrested for an offense that involves driving or operating a motor vehicle while under the influence of alcohol or drugs, or both, or you are the operator of a vehicle that was involved in an accident that caused the death of, great bodily harm to, or substantial bodily harm to a person, or you are suspected of driving or being on duty time with respect to a commercial motor vehicle after consuming an intoxicating beverage.

This law enforcement agency now wants to test one or more samples of your breath, blood or urine to determine the concentration of alcohol or drugs in your system. If any test shows more alcohol in your system than the law permits while driving, your operating privilege will be suspended. If you refuse to take any test that this agency requests, your operating privilege will be revoked and you will be subject to other penalties. The test results or the fact that you refused testing can be used against you in court.

If you take all the requested tests, you may choose to take further tests. You may take the alternative test that this law enforcement agency provides free of charge. You also may have a test conducted by a qualified person of your choice at your expense. You, however, will have to make your own arrangements for that test.

If you have a commercial driver license or were operating a commercial motor vehicle, other consequences may result from positive test results or from refusing testing, such as being placed out of service or disqualified."

(5) ADMINISTERING THE TEST; ADDITIONAL TESTS. (a) If the person submits to a test under this section, the officer shall direct the administering of the test. A blood test is subject to par. (b). The person who submits to the test is permitted, upon his or her request, the alternative test provided by the agency under sub. (2) or, at his or her own expense, reasonable opportunity to have any qualified person of his or her own choosing administer a chemical test for the purpose specified under sub. (2). If the person has not been requested to provide a sample for a test under sub. (3) (a), (am), or (ar), the person may request a breath test to be administered by the agency or, at his or her own expense, reasonable opportunity to have any qualified person administer any test specified under sub. (3) (a), (am), or (ar). The failure or inability of a person to obtain a test at his or her own expense does not preclude the admission of evidence of the results of any test administered under sub. (3) (a), (am), or (ar). If a person requests the agency to administer a breath test and if the agency is unable to perform that test, the person may request the agency to perform a test under sub. (3) (a), (am), or (ar) that it is able to perform. The agency shall comply with a request made in accordance with this paragraph.

(b) Blood may be withdrawn from the person arrested for violation of s. 346.63 (1), (2), (2m), (5), or (6) or 940.25, or s. 940.09 where the offense involved the use of a vehicle, or a local ordinance in conformity with s. 346.63 (1), (2m), or (5), or as provided in sub. (3) (am) or (b) to determine the presence or quantity of alcohol, a controlled substance, a controlled substance analog, or any other drug, or any combination of alcohol, controlled substance, controlled substance analog, and any other drug in the blood only by a physician, registered nurse, medical technologist, physician assistant, phlebotomist, or other medical professional who is authorized to draw blood, or person acting under the direction of a physician.

(c) A person acting under par. (b), the employer of any such person and any hospital where blood is withdrawn by any such person have immunity from civil or criminal liability under s. 895.53.

(d) At the trial of any civil or criminal action or proceeding arising out of the acts committed by a person alleged to have been driving or operating a motor vehicle while under the influence of an intoxicant, a controlled substance, a controlled substance analog or any other drug, or under the influence of any combination of alcohol, a controlled substance, a controlled substance analog and any other drug, to a degree which renders him or her incapable of safely driving, or under the combined influence of an intoxicant and any other drug to a degree which renders him or her incapable of safely driving, or having a prohibited alcohol concentration, or alleged to have been driving or operating or on duty time with respect to a commercial motor vehicle while having an alcohol concentration above 0.0 or possessing an intoxicating beverage, regardless of its alcohol content, or within 4 hours of having consumed or having been under the influence of an intoxicating beverage, regardless of its alcohol content, or of having an alcohol concentration of 0.04 or more, the results of a test administered in accordance with this section are admissible on the issue of whether the person was under the influence of an intoxicant, a controlled substance, a controlled substance analog or any other drug, or under the influence of any combination of alcohol, a controlled substance, a controlled substance analog and any other drug, to a degree which renders him or her incapable of safely driving or under the combined influence of an intoxicant and any other drug to a degree which renders him or her incapable of safely driving or any issue relating to the person's alcohol concentration. Test results shall be given the effect required under s. 885.235.

(e) At the trial of any civil or criminal action or proceeding arising out of the acts committed by a person alleged to have been driving or operating a motor vehicle while having a detectable amount of a restricted controlled substance in his or her blood, the results of a blood test administered in accordance with this section are admissible on any issue relating to the presence of a detectable amount of a restricted controlled substance in the person's blood. Test results shall be given the effect required under s. 885.235.

(6) REQUIREMENTS FOR TESTS. (a) Chemical analyses of blood or urine to be considered valid under this section shall have been

performed substantially according to methods approved by the laboratory of hygiene and by an individual possessing a valid permit to perform the analyses issued by the department of health services. The department of health services shall approve laboratories for the purpose of performing chemical analyses of blood or urine for alcohol, controlled substances or controlled substance analogs and shall develop and administer a program for regular monitoring of the laboratories. A list of approved laboratories shall be provided to all law enforcement agencies in the state. Urine specimens are to be collected by methods specified by the laboratory of hygiene. The laboratory of hygiene shall furnish an ample supply of urine and blood specimen containers to permit all law enforcement officers to comply with the requirements of this section.

(b) The department of transportation shall approve techniques or methods of performing chemical analysis of the breath and shall:

1. Approve training manuals and courses throughout the state for the training of law enforcement officers in the chemical analysis of a person's breath;

2. Certify the qualifications and competence of individuals to conduct the analysis;

3. Have trained technicians, approved by the secretary, test and certify the accuracy of the equipment to be used by law enforcement officers for chemical analysis of a person's breath under sub. (3) (a), (am), or (ar) before regular use of the equipment and periodically thereafter at intervals of not more than 120 days; and

4. Issue permits to individuals according to their qualifications.

Cross-reference: See also ch. Trans 311, Wis. adm. code.

(bm) Any relevant instruction, as defined in s. 101.02 (24) (a) 1., that an applicant for an approval, certification, or permit under par. (b) has obtained in connection with any military service, as defined in s. 111.32 (12g), counts toward satisfying any requirement for instruction for an approval, certification, or permit under par. (b) if the applicant demonstrates to the satisfaction of the department of transportation that the instruction obtained by the applicant is substantially equivalent to the instruction required for the approval, certificate, or permit under par. (b).

(c) For purposes of this section, if a breath test is administered using an infrared breath-testing instrument:

1. The test shall consist of analyses in the following sequence: one adequate breath sample analysis, one calibration standard analysis, and a 2nd, adequate breath sample analysis.

2. A sample is adequate if the instrument analyzes the sample and does not indicate the sample is deficient.

3. Failure of a person to provide 2 separate, adequate breath samples in the proper sequence constitutes a refusal.

(d) The department of transportation may promulgate rules pertaining to the calibration and testing of preliminary breath screening test devices.

(e) 1. In this paragraph, "licensor" means the department of health services or, with respect to permits issued under par. (b) 4., the department of transportation.

2. In addition to any other information required by the licensor, an application for a permit or laboratory approval under this subsection shall include the following:

a. Except as provided in subd. 2. am., in the case of an individual, the individual's social security number.

am. In the case of an individual who does not have a social security number, a statement made or subscribed under oath or affirmation that the applicant does not have a social security number. The form of the statement shall be prescribed by the department of children and families. A permit or approval that is issued or renewed under this section in reliance on a statement submitted under this subd. 2. am. is invalid if the statement is false.

b. In the case of a person who is not an individual, the person's federal employer identification number.

3. a. The licensor shall deny an application for the issuance or, if applicable, renewal of a permit or laboratory approval if the information required under subd. 2. a., am. or b. is not included in the application.

b. The licensor may not disclose any information received under subd. 2. a. or b. except to the department of children and families for purposes of administering s. 49.22, the department of revenue for the sole purpose of requesting certifications under s. 73.0301, and the department of workforce development for the sole purpose of requesting certifications under s. 108.227.

4. A permit under this subsection shall be denied, restricted, limited or suspended if the applicant or licensee is an individual who is delinquent in making court-ordered payments of child or family support, maintenance, birth expenses, medical expenses or other expenses related to the support of a child or former spouse, as provided in a memorandum of understanding entered into under s. 49.857.

5. If the licensor is the department of health services, the department of health services shall deny an application for the issuance or renewal of a permit or laboratory approval, or revoke a permit or laboratory approval already issued, if the department of revenue certifies under s. 73.0301 that the applicant or holder of the permit or laboratory approval is liable for delinquent taxes. An applicant for whom a permit or laboratory approval is not issued or renewed, or an individual or laboratory whose permit or laboratory approval is revoked, under this subdivision for delinquent taxes is entitled to a notice under s. 73.0301 (2) (b) 1. b. and a hearing under s. 73.0301 (5) (a) but is not entitled to any other notice or hearing under this subsection.

6. If the licensor is the department of health services, the department of health services shall deny an application for the issuance or renewal of a permit or laboratory approval, or revoke a permit or laboratory approval already issued, if the department of workforce development certifies under s. 108.227 that the applicant or holder of the permit or laboratory approval is liable for delinquent unemployment insurance contributions. An applicant for whom a permit or laboratory approval is not issued or renewed, or an individual or laboratory whose permit or laboratory approval is revoked, under this subdivision for delinquent unemployment insurance contributions is entitled to a notice under s. 108.227 (2) (b) 1. b. and a hearing under s. 108.227 (5) (a) but is not entitled to any other notice or hearing under this subsection.

**(7)** CHEMICAL TEST; ADMINISTRATIVE SUSPENSION. (a) If a person submits to chemical testing administered in accordance with this section and any test results indicate the presence of a detectable amount of a restricted controlled substance in the person's blood or a prohibited alcohol concentration, the law enforcement officer shall report the results to the department. The person's operating privilege is administratively suspended for 6 months.

(b) If a person who was driving or operating or on duty time with respect to a commercial motor vehicle submits to chemical testing administered in accordance with this section and any test results indicate an alcohol concentration above 0.0, the law enforcement officer shall issue a citation for violation of s. 346.63 (7) (a) 1., issue citations for such other violations as may apply and issue an out-of-service order to the person for the 24 hours after the testing, and report both the out-of-service order and the test results to the department in the manner prescribed by the department. If the person is a nonresident, the department shall report issuance of the out-of-service order to the driver licensing agency in the person's home jurisdiction.

**(8)** CHEMICAL TEST; ADMINISTRATIVE SUSPENSION; ADMINISTRATIVE AND JUDICIAL REVIEW. (a) The law enforcement officer shall notify the person of the administrative suspension under sub. (7) (a). The notice shall advise the person that his or her operating

privilege will be administratively suspended and that he or she has the right to obtain administrative and judicial review under this subsection. This notice of administrative suspension serves as a 30–day temporary license. An administrative suspension under sub. (7) (a) becomes effective at the time the 30–day temporary license expires. The officer shall submit or mail a copy of the notice to the department.

(am) The law enforcement officer shall provide the person with a separate form for the person to use to request the administrative review under this subsection. The form shall clearly indicate how to request an administrative review and shall clearly notify the person that this form must be submitted within 10 days from the notice date indicated on the form or the person's hearing rights will be deemed waived. The form shall, in no less than 16–point boldface type, be titled: IMPORTANT NOTICE — RESPOND WITHIN TEN (10) DAYS.

(b) 1. Within 10 days after the notification under par. (a), or, if the notification is by mail, within 13 days, excluding Saturdays, Sundays and holidays, after the date of the mailing, the person may request, in writing, that the department review the administrative suspension. The review procedure is not subject to ch. 227. Unless the hearing is by remote communication mechanism or record review, the department shall hold the hearing on the matter in the county in which the offense allegedly occurred or at the nearest office of the department if the offense allegedly occurred in a county in which the department does not maintain an office. The department, upon request of the person, may conduct a hearing under this paragraph by telephone, video conference, or other remote communication mechanism or by review of only the record submitted by the arresting officer and written arguments. The department shall hold a hearing regarding the administrative suspension within 30 days after the date of notification under par. (a). The person may present evidence and may be represented by counsel. The arresting officer need not appear at the administrative hearing unless subpoenaed under s. 805.07 and need not appear in person at a hearing conducted by remote communication mechanism or record review, but he or she must submit a copy of his or her report and the results of the chemical test to the hearing examiner.

2. The administrative hearing under this paragraph is limited to the following issues:

a. The correct identity of the person.

b. Whether the person was informed of the options regarding tests under this section as required under sub. (4).

bm. Whether the person had a prohibited alcohol concentration or a detectable amount of a restricted controlled substance in his or her blood at the time the offense allegedly occurred.

c. Whether one or more tests were administered in accordance with this section.

d. If one or more tests were administered in accordance with this section, whether each of the test results for those tests indicate the person had a prohibited alcohol concentration or a detectable amount of a restricted controlled substance in his or her blood.

e. If a test was requested under sub. (3) (a), whether probable cause existed for the arrest.

f. Whether the person was driving or operating a commercial motor vehicle when the offense allegedly occurred.

g. Whether the person had a valid prescription for methamphetamine or one of its metabolic precursors or gamma–hydroxybutyric acid or delta–9–tetrahydrocannabinol in a case in which subd. 4m. a. and b. apply.

3. The hearing examiner shall conduct the administrative hearing in an informal manner. No testimony given by any witness may be used in any subsequent action or proceeding. The hearing examiner may permit testimony by telephone if the site of the administrative hearing is equipped with telephone facilities to allow multiple party conversations.

4. The hearing examiner shall consider and determine the reliability of all of the evidence presented at the administrative hearing. Statements and reports of law enforcement officers are subject to the same standards of credibility applied to all other evidence presented.

4m. If, at the time the offense allegedly occurred, all of the following apply, the hearing officer shall determine whether the person had a valid prescription for methamphetamine or one of its metabolic precursors, gamma–hydroxybutyric acid, or delta–9–tetrahydrocannabinol:

a. A blood test administered in accordance with this section indicated that the person had a detectable amount of methamphetamine, gamma–hydroxybutyric acid, or delta–9–tetrahydrocannabinol but did not have a detectable amount of any other restricted controlled substance in his or her blood.

b. No test administered in accordance with this section indicated that the person had a prohibited alcohol concentration.

5. If the hearing examiner finds that any of the following applies, the examiner shall order that the administrative suspension of the person's operating privilege be rescinded without payment of any fee under s. 343.21 (1) (j), (jr), or (n):

a. The criteria for administrative suspension have not been satisfied.

b. The person did not have a prohibited alcohol concentration or a detectable amount of a restricted controlled substance in his or her blood at the time the offense allegedly occurred.

c. In a case in which subd. 4m. a. and b. apply, the person had a valid prescription for methamphetamine or one of its metabolic precursors, gamma–hydroxybutyric acid, or delta–9–tetrahydrocannabinol.

6. If the hearing examiner finds that all of the following apply, the administrative suspension shall continue regardless of the type of vehicle driven or operated at the time of the violation:

a. The criteria for administrative suspension have been satisfied.

b. The person had a prohibited alcohol concentration or a detectable amount of a restricted controlled substance in his or her blood at the time the offense allegedly occurred.

c. In a case in which subd. 4m. a. and b. apply, the person did not have a valid prescription for methamphetamine or one of its metabolic precursors, gamma–hydroxybutyric acid, or delta–9–tetrahydrocannabinol.

7. The hearing examiner shall notify the person in writing of the hearing decision, of the right to judicial review and of the court's authority to issue a stay of the suspension under par. (c). The administrative suspension is vacated and the person's operating privilege shall be automatically reinstated under s. 343.39 if the hearing examiner fails to mail this notice to the person within 30 days after the date of the notification under par. (a).

(c) 1. An individual aggrieved by the determination of the hearing examiner may have the determination reviewed by the court hearing the action relating to the applicable violation listed under sub. (3) (a), (am), or (ar). If the individual seeks judicial review, he or she must file the request for judicial review with the court within 20 days of the issuance of the hearing examiner's decision. The court shall send a copy of that request to the department. The judicial review shall be conducted at the time of the trial of the underlying offense under s. 346.63. The prosecutor of the underlying offense shall represent the interests of the department.

2. The court shall order that the administrative suspension be either rescinded or sustained and forward its order to the department. The department shall vacate the administrative suspension under sub. (7) unless, within 60 days of the date of the request for judicial review of the administrative hearing decision, the department has been notified of the result of the judicial review or of an

**Wisconsin Statutes Archive.**

order of the court entering a stay of the hearing examiner's order continuing the suspension.

3. Any party aggrieved by the order of a circuit court under subd. 2. may appeal to the court of appeals. Any party aggrieved by the order of a municipal court under subd. 2. may appeal to the circuit court for the county where the offense allegedly occurred.

4. A request for judicial review under this subsection does not stay any administrative suspension order.

5. If any court orders under this subsection that the administrative suspension of the person's operating privilege be rescinded, the person need not pay any fee under s. 343.21 (1) (j), (jr), or (n).

(d) A person who has his or her operating privilege administratively suspended under this subsection and sub. (7) (a) is eligible for an occupational license under s. 343.10 at any time.

**(9)** REFUSALS; NOTICE AND COURT HEARING. (a) If a person refuses to take a test under sub. (3) (a), the law enforcement officer shall immediately prepare a notice of intent to revoke, by court order under sub. (10), the person's operating privilege. If the person was driving or operating a commercial motor vehicle, the officer shall issue an out–of–service order to the person for the 24 hours after the refusal and notify the department in the manner prescribed by the department. The officer shall issue a copy of the notice of intent to revoke the privilege to the person and submit or mail a copy to the circuit court for the county in which the arrest under sub. (3) (a) was made or to the municipal court in the municipality in which the arrest was made if the arrest was for a violation of a municipal ordinance under sub. (3) (a) and the municipality has a municipal court. The officer shall also mail a copy of the notice of intent to revoke to the attorney for that municipality or to the district attorney for that county, as appropriate, and to the department. Neither party is entitled to pretrial discovery in any refusal hearing, except that, if the defendant moves within 30 days after the initial appearance in person or by an attorney and shows cause therefor, the court may order that the defendant be allowed to inspect documents, including lists of names and addresses of witnesses, if available, and to test under s. 804.09, under such conditions as the court prescribes, any devices used by the plaintiff to determine whether a violation has been committed. The notice of intent to revoke the person's operating privilege shall contain substantially all of the following information:

1. That prior to a request under sub. (3) (a), the officer had placed the person under arrest for a violation of s. 346.63 (1), (2m) or (5) or a local ordinance in conformity therewith or s. 346.63 (2) or (6), 940.09 (1) or 940.25 or had requested the person to take a test under sub. (3) (ar).

2. That the officer complied with sub. (4).

3. That the person refused a request under sub. (3) (a).

4. That the person may request a hearing on the revocation within 10 days by mailing or delivering a written request to the court whose address is specified in the notice. If no request for a hearing is received within the 10–day period, the revocation period commences 30 days after the notice is issued.

5. That the issues of the hearing are limited to:

a. Whether the officer had probable cause to believe the person was driving or operating a motor vehicle while under the influence of alcohol, a controlled substance or a controlled substance analog or any combination of alcohol, a controlled substance and a controlled substance analog, under the influence of any other drug to a degree which renders the person incapable of safely driving, or under the combined influence of alcohol and any other drug to a degree which renders the person incapable of safely driving, having a restricted controlled substance in his or her blood, or having a prohibited alcohol concentration or, if the person was driving or operating a commercial motor vehicle, an alcohol concentration of 0.04 or more and whether the person was lawfully placed under arrest for violation of s. 346.63 (1), (2m) or (5) or a local ordinance in conformity therewith or s. 346.63 (2) or (6), 940.09 (1) or 940.25.

b. Whether the officer complied with sub. (4).

c. Whether the person refused to permit the test. The person shall not be considered to have refused the test if it is shown by a preponderance of evidence that the refusal was due to a physical inability to submit to the test due to a physical disability or disease unrelated to the use of alcohol, controlled substances, controlled substance analogs or other drugs.

6. That, if it is determined that the person refused the test, there will be an order for the person to comply with assessment and a driver safety plan.

(am) If a person driving or operating or on duty time with respect to a commercial motor vehicle refuses a test under sub. (3) (am), the law enforcement officer shall immediately issue an out–of–service order to the person for the 24 hours after the refusal and notify the department in the manner prescribed by the department, and prepare a notice of intent to revoke, by court order under sub. (10), the person's operating privilege. The officer shall issue a copy of the notice of intent to revoke the privilege to the person and submit or mail a copy to the circuit court for the county in which the refusal is made or to the municipal court in the municipality in which the refusal is made if the person's refusal was in violation of a municipal ordinance and the municipality has a municipal court. The officer shall also mail a copy of the notice of intent to revoke to the attorney for that municipality or to the district attorney for that county, as appropriate, and to the department. Neither party is entitled to pretrial discovery in any refusal hearing, except that, if the defendant moves within 30 days after the initial appearance in person or by an attorney and shows cause therefor, the court may order that the defendant be allowed to inspect documents, including lists of names and addresses of witnesses, if available, and to test under s. 804.09, under such conditions as the court prescribes, any devices used by the plaintiff to determine whether a violation has been committed. The notice of intent to revoke the person's operating privilege shall contain substantially all of the following information:

1. That the officer has issued an out–of–service order to the person for the 24 hours after the refusal, specifying the date and time of issuance.

2. That the officer complied with sub. (4).

3. That the person refused a request under sub. (3) (am).

4. That the person may request a hearing on the revocation within 10 days by mailing or delivering a written request to the court whose address is specified in the notice. If no request for a hearing is received within the 10–day period, the revocation period commences 30 days after the notice is issued.

5. That the issues of the hearing are limited to:

a. Whether the officer detected any presence of alcohol, controlled substance, controlled substance analog or other drug, or a combination thereof, on the person or had reason to believe that the person was violating or had violated s. 346.63 (7).

b. Whether the officer complied with sub. (4).

c. Whether the person refused to permit the test. The person shall not be considered to have refused the test if it is shown by a preponderance of evidence that the refusal was due to a physical inability to submit to the test due to a physical disability or disease unrelated to the use of alcohol, controlled substances, controlled substance analogs or other drugs.

6. That if it is determined that the person refused the test there will be an order for the person to comply with assessment and a driver safety plan.

(b) The use of the notice under par. (a) or (am) by a law enforcement officer in connection with the enforcement of this section is adequate process to give the appropriate court jurisdiction over the person.

(c) If a law enforcement officer informs the circuit or municipal court that a person has refused to submit to a test under sub. (3) (a), (am), or (ar), the court shall be prepared to hold any requested hearing to determine if the refusal was proper. The

*Wisconsin Statutes Archive.*

scope of the hearing shall be limited to the issues outlined in par. (a) 5. or (am) 5. Section 967.055 applies to any hearing under this subsection.

(d) At the close of the hearing, or within 5 days thereafter, the court shall determine the issues under par. (a) 5. or (am) 5. If all issues are determined adversely to the person, the court shall proceed under sub. (10). If one or more of the issues is determined favorably to the person, the court shall order that no action be taken on the operating privilege on account of the person's refusal to take the test in question. This section does not preclude the prosecution of the person for violation of s. 346.63 (1), (2m), (5) or (7) or a local ordinance in conformity therewith, or s. 346.63 (2) or (6), 940.09 (1) or 940.25.

**(10)** REFUSALS; COURT–ORDERED REVOCATION. (a) If the court determines under sub. (9) (d) that a person improperly refused to take a test or if the person does not request a hearing within 10 days after the person has been served with the notice of intent to revoke the person's operating privilege, the court shall proceed under this subsection. If no hearing was requested, the revocation period shall begin 30 days after the date of the refusal. If a hearing was requested, the revocation period shall commence 30 days after the date of refusal or immediately upon a final determination that the refusal was improper, whichever is later.

(b) 1. Except as provided in subds. 3. and 4., the court shall revoke the person's operating privilege under this paragraph according to the number of previous suspensions, revocations or convictions that would be counted under s. 343.307 (2). Suspensions, revocations and convictions arising out of the same incident shall be counted as one. If a person has a conviction, suspension or revocation for any offense that is counted under s. 343.307 (2), that conviction, suspension or revocation shall count as a prior conviction, suspension or revocation under this subdivision.

2. Except as provided in subd. 3., 4. or 4m., for the first improper refusal, the court shall revoke the person's operating privilege for one year. After the first 30 days of the revocation period, the person is eligible for an occupational license under s. 343.10.

3. Except as provided in subd. 4m., if the number of convictions under ss. 940.09 (1) and 940.25 in the person's lifetime, plus the total number of other convictions, suspensions, and revocations counted under s. 343.307 (2) within a 10–year period, equals 2, the court shall revoke the person's operating privilege for 2 years. After the first 90 days of the revocation period or, if the total number of convictions, suspensions, and revocations counted under this subdivision within any 5–year period equals 2 or more, after one year of the revocation period has elapsed, the person is eligible for an occupational license under s. 343.10 if he or she has completed the assessment and is complying with the driver safety plan.

4. Except as provided in subd. 4m., if the number of convictions under ss. 940.09 (1) and 940.25 in the person's lifetime, plus the total number of other convictions, suspensions, and revocations counted under s. 343.307 (2), equals 3 or more, the court shall revoke the person's operating privilege for 3 years. After the first 120 days of the revocation period or, if the total number of convictions, suspensions, and revocations counted under this subdivision within any 5–year period equals 2 or more, after one year of the revocation period has elapsed, the person is eligible for an occupational license under s. 343.10 if he or she has completed the assessment and is complying with the driver safety plan.

4m. If there was a minor passenger under 16 years of age in the motor vehicle at the time of the incident that gave rise to the improper refusal, the applicable minimum and maximum revocation periods under subd. 2., 3. or 4. for the improper refusal are doubled.

5. The time period under this paragraph shall be measured from the dates of the refusals or violations which resulted in revocations or convictions.

(c) 1. Except as provided in subd. 1. a. or b., the court shall order the person to submit to and comply with an assessment by an approved public treatment facility as defined in s. 51.45 (2) (c) for examination of the person's use of alcohol, controlled substances or controlled substance analogs and development of a driver safety plan for the person. The court shall notify the person and the department of transportation of the assessment order. The court shall also notify the person that noncompliance with assessment or the driver safety plan will result in license suspension until the person is in compliance. The assessment order shall:

a. If the person is a resident, refer the person to an approved public treatment facility in the county in which the person resides. The facility named in the order may provide for assessment of the person in another approved public treatment facility. The order shall provide that if the person is temporarily residing in another state, the facility named in the order may refer the person to an appropriate treatment facility in that state for assessment and development of a driver safety plan for the person satisfying the requirements of that state.

b. If the person is a nonresident, refer the person to an approved public treatment facility in this state. The order shall provide that the facility named in the order may refer the person to an appropriate treatment facility in the state in which the person resides for assessment and development of a driver safety plan for the person satisfying the requirements of that state.

c. Require a person who is referred to a treatment facility in another state under subd. 1. a. or b. to furnish the department written verification of his or her compliance from the agency which administers the assessment and driver safety plan program. The person shall provide initial verification of compliance within 60 days after the date of his or her conviction. The requirement to furnish verification of compliance may be satisfied by receipt by the department of such verification from the agency which administers the assessment and driver safety plan program.

2. The department of health services shall establish standards for assessment procedures and the driver safety plan programs by rule. The department of health services shall establish by rule conflict of interest guidelines for providers.

3. Prior to developing a plan which specifies treatment, the facility shall make a finding that treatment is necessary and appropriate services are available. The facility shall submit a report of the assessment and the driver safety plan within 14 days to the county department under s. 51.42, the plan provider, the department of transportation and the person, except that upon request by the facility and the person, the county department may extend the period for assessment for not more than 20 additional workdays. The county department shall notify the department of transportation regarding any such extension.

(d) The assessment report shall order compliance with a driver safety plan. The report shall inform the person of the fee provisions under s. 46.03 (18) (f). The driver safety plan may include a component that makes the person aware of the effect of his or her offense on a victim and a victim's family. The driver safety plan may include treatment for the person's misuse, abuse or dependence on alcohol, controlled substances or controlled substance analogs, attendance at a school under s. 345.60, or both. If the plan requires inpatient treatment, the treatment shall not exceed 30 days. A driver safety plan under this paragraph shall include a termination date consistent with the plan which shall not extend beyond one year. The county department under s. 51.42 shall assure notification of the department of transportation and the person of the person's compliance or noncompliance with assessment and treatment. The school under s. 345.60 shall notify the department, the county department under s. 51.42 and the person of the person's compliance or noncompliance with the requirements of the school. Nonpayment of the assessment fee or, if the person has the ability to pay, nonpayment of the driver safety plan fee is noncompliance with the court order. If the department is

*Wisconsin Statutes Archive.*

notified of noncompliance, other than for nonpayment of the assessment fee or driver safety plan fee, it shall revoke the person's operating privilege until the county department under s. 51.42 or the school under s. 345.60 notifies the department that the person is in compliance with assessment or the driver safety plan. If the department is notified that a person has not paid the assessment fee, or that a person with the ability to pay has not paid the driver safety plan fee, the department shall suspend the person's operating privilege for a period of 2 years or until it receives notice that the person has paid the fee, whichever occurs first. The department shall notify the person of the suspension or revocation, the reason for the suspension or revocation and the person's right to a review. A person may request a review of a revocation based upon failure to comply with a driver safety plan within 10 days of notification. The review shall be handled by the subunit of the department of transportation designated by the secretary. The issues at the review are limited to whether the driver safety plan, if challenged, is appropriate and whether the person is in compliance with the assessment order or the driver safety plan. The review shall be conducted within 10 days after a request is received. If the driver safety plan is determined to be inappropriate, the department shall order a reassessment and if the person is otherwise eligible, the department shall reinstate the person's operating privilege. If the person is determined to be in compliance with the assessment or driver safety plan, and if the person is otherwise eligible, the department shall reinstate the person's operating privilege. If there is no decision within the 10–day period, the department shall issue an order reinstating the person's operating privilege until the review is completed, unless the delay is at the request of the person seeking the review.

(e) Notwithstanding par. (c), if the court finds that the person is already covered by an assessment or is participating in a driver safety plan or has had evidence presented to it by a county department under s. 51.42 that the person has recently completed assessment, a driver safety plan or both, the court is not required to make an order under par. (c). This paragraph does not prohibit the court from making an order under par. (c), if it deems such an order advisable.

(em) One penalty for improperly refusing to submit to a test for intoxication regarding a person arrested for a violation of s. 346.63 (2m) or (7) or a local ordinance in conformity therewith is revocation of the person's operating privilege for 6 months. If there was a minor passenger under 16 years of age in the motor vehicle at the time of the incident that gave rise to the improper refusal, the revocation period is 12 months. After the first 15 days of the revocation period, the person is eligible for an occupational license under s. 343.10. Any such improper refusal or revocation for the refusal does not count as a prior refusal or a prior revocation under this section or ss. 343.30 (1q), 343.307 and 346.65 (2). The person shall not be required to submit to and comply with any assessment or driver safety plan under pars. (c) and (d).

(f) The department may make any order which the court is authorized or required to make under this subsection if the court fails to do so.

(g) The court or department shall provide that the period of suspension or revocation imposed under this subsection or under sub. (7) shall be reduced by any period of suspension or revocation previously served under s. 343.30 (1p) or (1q) if both suspensions or revocations arose out of the same incident or occurrence. The court or department shall order that the period of suspension or revocation imposed under this subsection or sub. (7) run concurrently with any time remaining on a suspension or revocation imposed under s. 343.30 (1p) or (1q) arising out of the same incident or occurrence.

(10g) SUSPENSIONS AND REVOCATIONS; EXTENSIONS. For any suspension or revocation the court orders under sub. (10), the court shall extend the suspension or revocation period by the number of days to which the court sentences the person to imprisonment in a jail or prison.

(10m) REFUSALS; IGNITION INTERLOCK OF A MOTOR VEHICLE. The requirements and procedures for installation of an ignition interlock device under s. 343.301 apply when an operating privilege is revoked under sub. (10).

(11) RULES. The department shall promulgate rules under ch. 227 necessary to administer this section. The rules shall include provisions relating to the expeditious exchange of information under this section between the department and law enforcement agencies, circuit courts, municipal courts, attorneys who represent municipalities, district attorneys, and driver licensing agencies of other jurisdictions. The rules may not affect any provisions relating to court procedure.

**History:** 1987 a. 3, 27, 399; 1989 a. 7, 31, 56, 105, 359; 1991 a. 39, 251, 277; 1993 a. 16, 105, 315, 317, 491; 1995 a. 27 ss. 6412cnL, 9126 (19); 1995 a. 113, 269, 425, 426, 436, 448; 1997 a. 35, 84, 107, 191, 237, 290; 1999 a. 9, 32, 109; 2001 a. 16 ss. 3421m to 3423j, 4060gk, 4060hw, 4060hy; 2001 a. 104; 2003 a. 97, 199; 2005 a. 332, 413; 2007 a. 20 ss. 3303 to 3315, 9121 (6) (a); 2007 a. 136; 2009 a. 100, 103, 163; 2011 a. 120, 242; 2013 a. 36, 224.

**Cross–reference:** See also chs. DHS 62 and Trans 107 and 113, Wis. adm. code.

Administration of a blood or breathalyzer test does not violate a defendant's privilege against self–incrimination. State v. Driver, 59 Wis. 2d 35, 207 N.W.2d 850 (1973).

The implied consent law must be liberally construed to effectuate its policies since it was intended to facilitate the taking of tests for intoxication and not to inhibit the ability of the state to remove drunken drivers from the highway. Scales v. State, 64 Wis. 2d 485, 219 N.W.2d 286 (1974).

*Miranda* warnings are not required when an arrested driver is asked to submit to a test for intoxication under the implied consent statute. State v. Bunders, 68 Wis. 2d 129, 227 N.W.2d 727 (1975).

There is no right to counsel prior to submitting to an intoxication test. A driver is obliged to promptly take or refuse the test. State v. Neitzel, 95 Wis. 2d 191, 289 N.W.2d 828 (1980).

The state need not prove that notices were sent to state officers under sub. (3) (b), 1985 stats. [now sub. (9) (a)]. State v. Polinski, 96 Wis. 2d 43, 291 N.W.2d 465 (1980).

When an officer initially requested a breath test, it was not an irrevocable election preventing the officer from requesting a urine test instead. The driver's refusal to submit urine justified revocation of his driver's license. State v. Pawlow, 98 Wis. 2d 703, 298 N.W.2d 220 (Ct. App. 1980).

The state need not affirmatively prove compliance with administrative code procedures as a foundation for admission of a breathalyzer test. City of New Berlin v. Wertz, 105 Wis. 2d 670, 314 N.W.2d 911 (Ct. App. 1981).

When a driver pled guilty to the underlying OWI charge, a charge of refusing a test under s. 343.305, 1979 stats., was properly dismissed as unnecessary. State v. Brooks, 113 Wis. 2d 347, 335 N.W.2d 354 (1983).

A breathalyzer approved in the administrative code has a prima facie presumption of accuracy. State v. Dwinell, 119 Wis. 2d 305, 349 N.W.2d 739 (Ct. App. 1984).

When blood alcohol content is tested under statutory procedures, the results of the test are mandatorily admissible. The physical sample tested is not evidence intended, required, or even susceptible of being produced by state under s. 971.23. State v. Ehlen, 119 Wis. 2d 451, 351 N.W.2d 503 (1984).

A judge's erroneous exclusion of a defendant's explanation for a refusal to take a blood test was not harmless error. State v. Bolstad, 124 Wis. 2d 576, 370 N.W.2d 257 (1985).

At a revocation hearing under sub. (3) (b) 5., 1985 stats. [now sub. (9) (a) 5.], the state need not establish to a reasonable certainty that the defendant was the actual driver of the vehicle stopped by the police. The probable cause standard satisfies due process. State v. Nordness, 128 Wis. 2d 15, 381 N.W.2d 300 (1986).

In sub. (2) (c), 1985 stats. [now sub. (3) (b)], "not capable of withdrawing consent," must be construed narrowly and applied infrequently. State v. Disch, 129 Wis. 2d 225, 385 N.W.2d 140 (1986).

Under the facts of the case, the state's refusal to provide an alternative blood alcohol test did not violate due process. State v. McCrossen, 129 Wis. 2d 277, 385 N.W.2d 161 (1986).

An arresting officer need not inform an accused that a test refusal can be used against the accused at trial. State v. Crandall, 133 Wis. 2d 251, 394 N.W.2d 905 (1986).

A mental disorder cannot justify a test refusal unless it is severe enough that the driver is deemed under sub. (3) (b) not to have refused at all. State v. Hagaman, 133 Wis. 2d 381, 395 N.W.2d 617 (Ct. App. 1986).

The implied consent law does not prevent the state from obtaining chemical test evidence by alternative constitutional means. State v. Zielke, 137 Wis. 2d 39, 403 N.W.2d 427 (1987).

Appeal of an oral revocation order under sub. (10) may not be taken under s. 808.03 (1). State v. Borowski, 164 Wis. 2d 730, 476 N.W.2d 316 (Ct. App. 1991).

Evidence of refusal was not admissible when the defendant was not fully informed of the consequences in accordance with (former) sub. (4). State v. Algaier, 165 Wis. 2d 515, 478 N.W.2d 292 (Ct. App. 1991).

Substantial compliance with the requirements of (former) sub. (4) when the defendant was actually informed of all rights and penalties relating to him was sufficient. State v. Piskula, 168 Wis. 2d 135, 483 N.W.2d 250 (Ct. App. 1992). See also Village of Oregon v. Bryant, 188 Wis. 2d 680, 524 N.W.2d 635 (1994).

The sub. (9) (a) requirement that a notice of intent to revoke be prepared and served immediately is directory and not mandatory. State v. Moline, 170 Wis. 2d 531, 489 N.W.2d 667 (Ct. App. 1992).

An accused's request under sub. (5) (a) for his or her own test only requires the arresting agency to make the accused available to obtain the test, not to take an active